UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | Case No. 01-67459<br>Chapter 11 Case |
| FRANKLIN INDUSTRIAL COMPLEX, INC., | |
| Debtor. | |

| | |
|---|---|
| IN RE: | Case No. 01-67458<br>Chapter 11 Case |
| CHRISTINE FALLS OF NEW YORK, INC., | |
| Debtor. | |

| | |
|---|---|
| IN RE: | Main Case No. 01-67457<br>Chapter 11 Case |
| TRAFALGAR POWER, INC., | Jointly Administered |
| Debtor. | |

## AMENDED DISCLOSURE STATEMENT FOR
## TRAFALGAR POWER, INC.

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR
REJECTION OF THE PLAN OF REORGANIZATION.
ACCEPTANCE OR REJECTION MAY NOT BE
SOLICITED UNTIL A DISCLOSURE STATEMENT
HAS BEEN APPROVED BY THE BANKRUPTCY COURT.
THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.

COURT APPROVAL OF THIS DISCLOSURE STATEMENT
DOES NOT CONSTITUTE A RECOMMENDATION AS
TO THE MERITS OF THE CHAPTER 11 PLAN.

Dated: January _5_, 2006

Wendy A. Kinsella, Esq. (Bar Roll No. 508699)
HARRIS BEACH PLLC
One Park Place, Fourth Floor
300 South State Street
Syracuse, NY  13202
Telephone:  (315) 423-7100

## I.    INTRODUCTION

These cases were commenced by the filing of Voluntary Chapter 11 Bankruptcy Petitions on August 27, 2001 (the "Petition Date') with the United States Bankruptcy Court for the Eastern District of North Carolina. By Order Transferring Venue dated December 13, 2001, the venue of the Debtors' cases was transferred to the United States Bankruptcy Court for the Northern District of New York, where it has remained since that time.

Thereafter, the Debtors-In-Possession, pursuant to §§1107 and 1108 of the Bankruptcy Code (the "Code"), have continued to conduct the business affairs of the Debtors.

The Debtor-In-Possession, Trafalgar Power, Inc., has prepared an Amended Plan of Reorganization (the "Plan") and the within Amended Disclosure Statement (the "Disclosure Statement") in accordance with Bankruptcy Rules 3016 and 3018, etc.

The purpose of the Disclosure Statement is to give holders of claims and interests sufficient information to permit them to cast an informed vote to accept or reject the Plan. The Debtor believes that acceptance of the Plan is in the best interest of each class of creditors and interest holders and recommends that each creditor and interest holder vote to accept the Plan.

The Court will set a date and time for a hearing on the acceptance of the Plan. Creditors may vote for or against the Plan by filling out and mailing an Acceptance Form ("Ballot") to the entity designated by the Court, within the time period fixed by the Court for receipt of Ballots.

The vote for each creditor entitled to vote is important. The Plan will be accepted if it is approved by each class of those voting creditors who hold at least 2/3 in dollar amounts and comprise ½ in number of the voting claims of the class in question.

## II.    DISCLAIMER

COPIES OF THE PLAN WILL BE SENT WITH THIS DISCLOSURE STATEMENT TO EACH CREDITOR OR INTEREST HOLDER ENTITLED TO VOTE ON THE PLAN. THE DEFINITIONS CONTAINED IN THE PLAN APPLY TO THIS DISCLOSURE STATEMENT AND EACH RECIPIENT OF THIS DISCLOSURE STATEMENT IS URGED TO REVIEW THE PROVISIONS OF THE PLAN WITH CARE.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S FINANCIAL CONDITION, THE PLAN OR THE VALUE OF THE DEBTOR'S ASSETS ARE AUTHORIZED BY THE DEBTOR OTHER THAN SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, WHICH ARE OTHERWISE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY ANY CLAIMANT OR INTEREST HOLDER IN REACHING A DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO SHALL, IN TURN, DELIVER SUCH INFORMATION TO THE COURT WHICH SHALL THEN ACT APPROPRIATELY.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT OR TO ANY OTHER ACCOUNTING REVIEW. DUE TO THE ACCOUNTING COMPLEXITIES INHERENT IN ANY CHAPTER 11 CASE, THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, AND THE STATE OF THE DEBTOR'S FINANCIAL, LEGAL AND ACCOUNTING RECORDS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT AN INACCURACY, ALTHOUGH GREAT EFFORT

HAS BEEN MADE TO BE ACCURATE. DISTRIBUTION PROJECTIONS HAVE BEEN MADE SOLELY UPON THE EXPECTATIONS OF THE DEBTOR WITH RESPECT TO FUTURE REVENUES AND OPERATION EXPENSES, AS WELL AS THE ALLOWANCE OF VARIOUS CLAIMS.

CREDITORS ARE URGED TO READ ALL OF THE MATERIAL ENCLOSED AND THEN TO CONSULT WITH THEIR PROFESSIONAL ADVISORS OR OTHERS WHOM THEY DEEM HELPFUL BEFORE REACHING THEIR DECISION ABOUT THE PLAN.

### III.   HISTORY OF THE DEBTOR EVENTS LEADING TO FILING AND THE CHAPTER 11 PROCEEDING

The Debtors Marina Development, Inc. ("Marina"), Franklin Industrial Complex, Inc. ("Franklin"), Trafalgar Power, Inc. ("Trafalgar"), Christine Falls of New York, Inc. ("Christine Falls"), and Pine Run of Virginia, Inc. ("Pine Run"), (collectively the "Debtors"), filed separate Voluntary Chapter 11 Petitions on August 27, 2001.

Marina is a Delaware Corporation and a holding company which owns all of the shares of stock of Trafalgar, Franklin, and Pine Run. Christine Falls is a New York corporation, and a wholly owned subsidiary of Trafalgar, which owns and operates one hydro-electric power project in New York State. Franklin is a New Hampshire corporation which owned two hydro-electric power projects located in Franklin, New Hampshire. Trafalgar is a Delaware corporation which owns and operates six (6) hydro-electric power projects in central and northern New York State. Pine Run is a Delaware corporation which the Debtors allege has loaned or otherwise funded substantial sums to the other Debtors for the development, operation, and support of the various hydro-electric projects. While the within Disclosure Statement and the Plan are being proposed by Trafalgar only, Christine Falls and Franklin are separately filing Disclosure Statements and Plans simultaneously herewith. Marina and Pine Run filed motions to sever and

dismiss their bankruptcy cases. By Order dated November 29, 2005, the Court dismissed Pine Run's bankruptcy. By Order dated December 22, 2005, the Court dismissed Marina's bankruptcy case. As the histories of the Debtors have been intertwined and the events leading to the filings occurred over an extended period of time, the Debtor believes a better understanding can be had by differentiating amongst the various claimants in these proceedings, and provides the following background information for creditors' review.

### A.    BACKGROUND REGARDING THE HYDRO INVESTORS' CLAIMS AND THE STETSON-HARZA LAWSUIT

Arthur Steckler ("Steckler") was a Canadian real estate developer whose family's business principally involved acquiring raw land, improving it and selling it to builders for residential construction.

As part of that business, Steckler acquired a small office building in Franklin, New Hampshire in the early 1980s. A retired, inactive hydro-electric plant was located on that property and, after undertaking an investigation, Steckler concluded that if the plant could be restored, it could generate cheaper power for his tenants. The Debtor, Franklin, was formed to acquire that office building. It later constructed a second hydro-electric project at Franklin, which is known as the River Bend project.

During that process, Steckler was introduced to Neal Dunlevy ("Dunlevy"), then an engineer with Stetson-Dale (subsequently known as Stetson-Harza), an engineering firm based in Utica, New York. Dunlevy was, and upon information and belief still is, the sole shareholder of Hydro Investors, Inc. ("HII"). Dunlevy suggested to Steckler that there were excellent opportunities for developing small, retired hydro sites in New York, that Stetson-Dale had inventoried all of these sites, and knew which of them could be developed profitably.

Dunlevy suggested to Steckler a business relationship, one where Steckler would provide the capital necessary to develop some of these retired hydro sites and where Dunlevy's employer, Stetson-Dale (later Stetson-Harza), would contribute its knowledge of which sites could be developed profitably, as well as rendering the services and expertise necessary to license and develop the projects.

Steckler is the sole shareholder of the Debtor Marina which, in turn, owns all of the shares of the Debtor Trafalgar. In 1987, Trafalgar developed seven (7) hydro-electric plants in upstate New York. Six of the New York projects are located at Ogdensburg, Forestport, Adams, Kayuta Lake, Cranberry Lake and Herkimer. Trafalgar is also the sole shareholder of Christine Falls, which owns the Christine Falls hydro-electric power project. The Debtor Franklin, which is also a subsidiary of Marina, formerly owned two hydro-electric projects located in Franklin, New Hampshire.

After extensive discussion with Dunlevy, Steckler elected to develop several of the sites identified by Dunlevy and Stetson-Dale, including:   Adams, Kayuta Lake, Ogdensburg, Forestport, Cranberry Lake, Christine Falls and Herkimer. The licensing and development activity was accomplished through the Debtor Trafalgar, a corporation created by Steckler.

In October, 1985, Steckler entered into a contract with Stetson-Dale whereby the latter party agreed to provide engineering services for the licensing of the projects. During late 1985, and early 1986, Dunlevy, as an employee of Stetson-Dale, began negotiations to acquire the property interests necessary to complete the licensing process, and also began work on the various licensing applications. The applications were to be filed with, and approved by, the Federal Energy Regulatory Commission ("FERC").

In 1985, Dunlevy proposed a joint venture between Stetson-Dale (Stetson-Harza's predecessor) and Trafalgar to develop these projects. Draft agreements were prepared and reviewed by the parties, with Dunlevy coordinating Stetson-Dale's negotiations with Steckler. No agreement was ever reached by these parties because, while these negotiations were proceeding, Stetson-Dale was acquired by Stetson-Harza Engineering Company ("Stetson-Harza"), a large Midwestern engineering firm, which had no interest in pursuing the joint venture with Steckler.

Dunlevy, however, was personally interested in the proposal, and discussed with his employer his desire to "go into the hydro business" with Steckler, even while he remained employed with Stetson-Harza. Mr. Stetson consented and Dunlevy, through HII, thereafter entered into an agreement with Trafalgar, dated August 1, 1985, (the "Agreement") which defined HII's and Trafalgar's rights and obligations relating to the development of the hydro plants. The Agreement is the document under which HII claims an interest in Trafalgar's hydro-electric projects, which are the property of the bankruptcy estate. The Agreement (p. 4) specifically required that Forms of Schedule be executed to define each party's interest in a particular project.

During 1986 and 1987, Trafalgar developed these seven (7) hydro projects. Pursuant to Trafalgar's contract with Stetson-Harza, Stetson-Harza provided the engineering services relating to the licensing of the projects. It was paid nearly $1 Million for its services in this regard. During this time, Dunlevy continued to be involved with the work on the projects. Until the beginning of 1987, he remained an employee of Stetson-Harza; in fact, he was the head of Stetson-Harza's Water Resources Department, which was responsible for the Trafalgar hydro work. In February, 1987, Dunlevy left Stetson-Harza, but continued to work on the hydro

7

projects' development through HII which was, in effect, responsible for managing the construction of the plants and Trafalgar's relationship with Stetson-Harza. During this time, Dunlevy (HII) was paid an annual consulting fee of approximately $72,000.00 by Trafalgar. Trafalgar also reimbursed or paid Dunlevy's (HII's) office and overhead expenses.

Dunlevy prepared only three (3) Forms of Schedule pursuant to the Agreement, which Steckler executed on behalf of Trafalgar. The Forms of Schedule (which defined HII's and Trafalgar's rights and obligations for each plant developed) related to the Ogdensburg, Herkimer and Cranberry Lake projects. Other writings memorialized Trafalgar's and HII's agreement regarding the parties' rights and obligations relating to the Kayuta Lake, Adams and Forestport projects. No Form of Schedule or other writing was executed by Trafalgar or Steckler for the Christine Falls project.

HII sued Trafalgar in federal court on February 27, 1989, seeking equitable and monetary relief based upon an alleged breach of joint venture agreements with respect to the projects at Forestport, Ogdensburg, Herkimer, Adams, Kayuta Lake, and Cranberry Lake. The Christine Falls project was the subject of a separate state court complaint by HII. It was apparently not included in the federal litigation because there was no basis for federal jurisdiction. The lawsuit filed in the Northern District of New York was based on, among other things, the Agreement and Forms of Schedule relating to the development of some of those projects.

Thereafter, Trafalgar sued Dunlevy, the principal of HII, as well as Stetson-Harza (Dunlevy's former employer), the engineering firm that performed licensing and other services for Trafalgar on the projects. The Complaint was filed on August 24, 1989, in federal court in the Northern District of New York. Both HII and Trafalgar's lawsuits were consolidated for trial.

Thereafter, HII amended its Complaint in the federal action on July 1, 1991 to add Marina and Steckler as additional defendants. Trafalgar also filed an Amended Complaint in the federal action following dismissal of certain of its claims. Trafalgar's Amended Complaint was limited to breach of contract and negligence claims.

These actions were tried before a jury in March and April 1999 before the Honorable David Hurd, then Magistrate Judge in the United States District Court for the Northern District of New York. Testimony was taken from, among others, HII's principal, Dunlevy, and Trafalgar's principal, Steckler, as well as engineering expert witnesses for the parties. Trafalgar's negligence claims regarding the Ogdensburg and Forestport projects, and HII's claims for breach of Agreement relating to the Ogdensburg, Forestport, Adams, Kayuta Lake, Cranberry Lake and Herkimer projects, were submitted to the jury.

While the jury found that a joint venture agreement between HII and Trafalgar existed with respect to each of these six (6) projects, it also found that neither Trafalgar nor Steckler had breached its obligations to HII under the Agreement, or any other agreement.

Trafalgar's defense to HII's claims was that necessary conditions precedent before which HII could obtain its claimed interest in the projects had not been met by HII. Specifically, Steckler testified that HII's interest in the projects, as outlined in the Forms of Schedule and other writings, would not mature unless and until (i) the projects were completed within the time contained in the Form of Schedule, (ii) within the agreed upon budget set forth in the Form of Schedule, and (iii) once completed, generated the expected energy contained in the Form of Schedule which was necessary to pay off the project debt.

Parenthetically, the nature of HII's claimed "interest" in these projects is not an equity interest. Rather, it is, as described in the Agreement, an interest in the excess cash flow of the

particular project. Excess cash flow is defined by the Agreement as the cash flow available after Steckler's considerable equity investment and the project debt was repaid.

In April 1999 the jury returned a verdict in Trafalgar's favor, finding that it had not breached any of the agreements it may have had with HII. The jury's verdict reflected the testimony and other evidence offered at trial which demonstrated that the conditions precedent to Trafalgar's obligations under the August 1, 1985 Agreement were never met, because each of the six (6) projects for which joint ventures were formed was not completed by the agreed upon date, cost Steckler and Trafalgar substantially more to develop than was budgeted, and even then generated only a fraction of the expected energy.

The jury also found that Dunlevy, the principal of HII, and Stetson-Harza were negligent, and awarded Trafalgar damages of $9,500,000 with a reduction of 20% for Trafalgar's comparative fault, resulting in a verdict of $7,600,000 in Trafalgar's favor. The verdict was modified by the Second Circuit Court of Appeals on September 15, 2000, in <u>Hydro Investors, Inc. v. Trafalgar Power, Inc.</u>, 227 F.3d 8 (2d Cir. 2000). The judgment was modified to award interest to Trafalgar, resulting in a final judgment of approximately $11.1 million. The judgment was thereafter satisfied with a payment from Stetson-Harza's insurance carrier.

Approximately five years after the verdict in the <u>Stetson-Harza</u> litigation, and three years after the appeal was decided, HII and Dunlevy, its principal, moved to set aside the judgment in that action under Fed. R. Civ. P. 60(b). Their 60(b) application made wild and unsupported allegations of fraud on the part of Steckler and Harris Beach. HII and Dunlevy claimed that Harris Beach and Trafalgar had concealed certain documents (including publicly available documents from the City of Ogdensburg) and had conspired to commit a fraud on the Court.

Judge David N. Hurd, the presiding United States District Judge, summarily dismissed the application with a short opinion.

The $10 Million proceeds from the judgment are currently being held in escrow in an HSBC account pursuant to Court Order and Stipulation, as discussed below.  As of August 31, 2005 the balance in the escrow account was $9,691,363.12.

## B.     BACKGROUND REGARDING THE HYDRO INVESTORS, INC. – CHRISTINE FALLS LITIGATION

As noted, a separate lawsuit was instituted by HII in state court regarding the Christine Falls project.  HII's former counsel, who initiated that action, specifically stated that the action was not joined with the federal court action only because one of the defendants, Christine Falls, was a New York State entity, and plaintiff could not join Christine Falls without destroying federal court jurisdiction in the companion action.  Although HII's former counsel essentially conceded that resolution of the federal court action would also "dispose of this case," HII continues to press this lawsuit even though the federal lawsuit was resolved against it.

Indeed, after the case lay dormant for years (it was instituted in 1989), HII resumed prosecution in 2000.  After a period of discovery, HII moved for an accounting and a constructive trust, and Trafalgar and Christine Falls cross-moved for summary judgment.  The Supreme Court denied HII's motion for an accounting and a constructive trust, finding that it had not established the existence of a joint venture, and denied Trafalgar's motion for summary judgment.  The Appellate Division, Third Department, affirmed.

HII, however, has not shown that it is likely to succeed at trial.  As the Christine Falls Project was not constructed within budget, and did not generate the necessary and expected energy, the conditions precedent to the creation of HII's interest in the project did not occur.  The

matter is currently back in State Court and Debtor Christine Falls expects to proceed to trial and to succeed on the merits, defeating HII's claim in its entirety.

### C.    BACKGROUND REGARDING THE FERC PROCEEDINGS BROUGHT BY HYDRO INVESTORS, INC.

Despite failing to establish an interest in the projects in federal court, HII filed a petition in 2002 with FERC claiming that Trafalgar violated the Federal Power Act and that it, along with the projects' manager and purported holder of the debt, Algonquin Power Corporation, improperly diverted funds from the projects.  This petition was one of many filed with FERC seeking the relief that HII was denied in the litigation in federal court.  As noted by FERC, HII has pursued its claims to a joint venture interest in Trafalgar's projects "unsuccessfully .... for over 12 years," and FERC dismissed these claims as "baseless."  See Hydro Investors, Inc. v. Trafalgar Power, Inc., 98 F.E.R.C. 61272, 62063 (March 13, 2002), and reh'g denied, 99 F.E.R.C. 61384, 62632 (June 28, 2002).  The D.C. Circuit affirmed the dismissal of HII's petition because HII lacked standing to bring its petition and thus it had no interest in the projects (including Christine Falls).  Hydro Investors, Inc. v. F.E.R.C., 351 F.3d 1192 (D.C. Cir. 2003). The D.C. Circuit found that the joint venture agreement provided that HII "would receive distributions from project profits only if Trafalgar, among other things, recovered its capital investment in the projects, and only if the projects were constructed within budget and met the expected energy output."  Id. at 1194-95.  It held that "neither of these conditions has occurred or is remotely ever to occur" and characterized the projects as "financial disasters."  Id. at 1196.

### D.    HII'S CLAIMS IN THE BANKRUPTCY CASES

Despite having these claims rejected by two federal courts of appeal, HII continues, in serial litigation fashion, to assert an interest in the projects owned by Trafalgar and Christine Falls in this bankruptcy proceeding.  HII filed proofs of claim against the bankruptcy estate

relating to the seven New York projects, and even instituted a separate adversary proceeding against the debtors seeking a share of the project profits. Back in 2002 the Debtors moved to dismiss HII's proofs of claim, under 11 U.S.C. §502. HII filed opposition to Debtors' motion alleging a myriad of arguments against disallowance of the claims. Additional pleadings in support of and in opposition to Debtors' motion were submitted.

On March 31, 2005, a hearing was held on Debtors' motion before the Bankruptcy Court. At the hearing, HII's counsel admitted that HII was not a creditor of any of the Debtors. In its August 16, 2005 Decision, this Court disallowed HII's First Claim against Marina, Second Claim against Franklin, and Third Claim against Trafalgar. The First and Second Claims, both based on misappropriation, were disallowed on two separate grounds: 1) the claims were time-barred under the statute of limitations; and 2) HII's admission that it is not a creditor of any of the Debtors.

The Court also disallowed HII's Third Claim against Trafalgar for two separate and independent reasons. First, the Court held that the Third Claim was disallowed based upon HII's admission that Trafalgar is not liable to HII on that claim. Second, the Court justifiably relied on the findings of the District Court, Second Circuit Court and D.C. Circuit Courts, all of which held that "the conditions precedent, including meeting the expected energy output at the six project locations, had not been met which would have entitled HII to share in any net profits."

The Court adjourned the Debtors' motion on disallowance of the Fourth Claim asserted against Christine Falls indefinitely, pending a determination of the action pending in State Court (Hydro Investors Inc. v. Christine Falls of New York, Inc. and Trafalgar Power, Inc., Index No. 3913).

On or about August 26, 2005, HII filed a motion to reconsider alleging a whole new host of arguments in support of its various Claims against the Debtors, which the Debtors opposed.

At oral argument on September 27, 2005, the Court denied HII's motion to reconsider. An appeal has been filed by HII.

**E.    THE ALGONQUIN DISTRICT COURT LITIGATION**

Certain of the Debtors, Trafalgar, Pine Run and Marina, are currently in litigation against the purported current and former owners of certain debt instruments relating to the projects. To develop the hydro power projects, Trafalgar sought debt financing that was originally provided by Bay Bank Boston in the approximate amount of $17,000,000, an obligation that Steckler personally guaranteed. To obtain this loan, Trafalgar was also required to make a substantial equity contribution, which it did. A substantial portion of the equity contribution came from Pine Run. Moreover, over time, Pine Run advanced substantial additional funds to Trafalgar in connection with the projects' development. These funds originated with loans or purchases of preferred stock in Pine Run that were made by Canadian companies owned by members of Steckler's family or by members of his family directly.

In the late 1980's, as the development proceeded, Bay Bank elected not to become the projects' term lender; consequently, a new term lender had to be located. Aetna Life Insurance Company ("Aetna") became the term lender for the projects, and eventually agreed to make a project finance term loan in the amount of $22,500,000. Primarily due to Dunlevy's engineering malpractice, the projects were unable to generate sufficient revenue to enable Trafalgar to service the Aetna debt. The Aetna loan thus went into default. At the same time, during the late 1980's and through the mid-1990's, the cash needs of the projects (for items such as operations, repairs, maintenance, compliance with FERC regulations and orders) were unabating. As a result,

14

Trafalgar was compelled to find additional economic resources to meet these demands.    It
borrowed substantial additional funds from related Steckler family companies.

In the mid-1990's, with its loan still in default, Aetna commenced an action to foreclose
its mortgage.    Although it filed a summons and complaint, the action never proceeded because
Trafalgar and Aetna negotiated a resolution of their dispute.    That resolution involved
restructuring the Aetna loan, which resulted in the creation of certain debt instruments, the "A"
and "B" Notes.

Effective as of January 15, 1996, Trafalgar and Aetna entered into a Loan Agreement,
and Aetna abandoned its foreclosure action, advanced or caused to be advanced additional funds
(approximately $1,350,000.00) for needed repairs to the projects, and restructured the underlying
debt.    As part of this arrangement, however, Aetna insisted that the projects be managed by a
party other than Trafalgar.    Algonquin Power Corporation ("Algonquin") eventually became the
manager of the projects.    Since that time, Algonquin has been controlling the Debtors' 6 hydro-
electric power plants under the terms of a management agreement.

During the January, 1996 restructuring process, Algonquin also acted as Trafalgar's agent
in that negotiation, and did a cash flow analysis as part of that process.    The debt was
restructured into two notes because, based on Algonquin's projections, it was believed that the
projects could only service the debt related to the "A" Note.    The "B" Note represented the
remainder of the debt that would either be paid at a much later date after the "A" Note was
retired, or written-off.

Periodic payments were made on these Notes from the cash flow of the projects (in fact,
based upon Algonquin's statements, it appears that the "A" Note has been paid in its entirety).
From a preliminary audit of documents Algonquin produced, it appears that cash flow from the

15

projects was also used pre-petition to pay down the "B" Note debt, which appears to be inconsistent with the terms of that debt instrument.

During the negotiations of the Loan Agreement, Trafalgar suggested that it be given a right of first refusal to purchase either or both the Notes in the event that Aetna sold them to a third party. Trafalgar and Aetna eventually agreed to a limited Right of First Refusal. That right provides, in substance, that if Aetna received an offer from Algonquin to purchase either the "A" or "B" Note, then notice of this offer had to be given to Trafalgar. Once notified, Trafalgar could elect to purchase either (or both) notes if it paid 105% of the amount offered by Algonquin, and made that payment "not less than ten (10) nor more than sixty (60)" days after giving notice of this election.

Shortly after the Loan Agreement was executed, Aetna decided to sell the "B" note for certain tax advantages.  Aetna and Algonquin thereafter apparently entered into private negotiations relating to a potential sale of the "B" Note to Algonquin. Ultimately, Aetna agreed to sell Algonquin that Note.  Pursuant to the requirements of the Loan Agreement, Aetna, on November 27, 1996, gave Trafalgar notice of its intent to sell the $15,800,000 "B" Note to Algonquin for only $94,000.  As Algonquin and Aetna had agreed that Algonquin could purchase the $15,800,000 "B" Note for $94,000, Trafalgar had the right under the Loan Agreement to acquire that Note for 105% of the sum offered by Algonquin, or $98,700.  To do so, Trafalgar needed only to notify Aetna that it was exercising this right, make a $50,000 payment to Aetna as a deposit in connection with the purchase, and then pay the balance of the purchase price (or $48,700) within 10 to 60 days thereafter.

Trafalgar gave Aetna notice on November 29, 1996 that it intended to exercise its Right of First Refusal to purchase the "B" Note.  Trafalgar's official Notice of Exercise, with the

$50,000 down payment, was sent to Aetna on December 17, 1996, and both Algonquin and Aetna concede that the Notice of Exercise was timely. By the terms of the Loan Agreement, Trafalgar was required to complete the purchase of the "B" Note not earlier than December 28, 1996 and no later than February 16, 1997. Because February 16, 1997 fell on a Sunday, and the next day February 17, 1997 was a national holiday, President's Day, Trafalgar actually had until the 18th to complete the closing of the "B" Note. To complete the acquisition, Steckler hand delivered the balance of the required payment (a $48,700 bank draft) to Aetna on February 17, 1997, a day before the 60-day contractual period expired, even though it was a national holiday. As Trafalgar made the final payment to Aetna on February 17, 1997, and thus completed the purchase of the "B" Note within the period required by the Loan Agreement, it was entitled to have that Note conveyed to it.

Although Aetna was prepared to transfer the "B" Note to Trafalgar after it made the final payment on February 17, 1997, Algonquin objected to and interfered with the transfer. In fact, Algonquin went so far as to retain counsel and threaten Aetna with litigation if the "B" Note were not transferred to it. Aetna eventually agreed to sell the "B" Note to Algonquin Power Income Fund ("APIF") on March 27, 1997. As part of this transaction, it is alleged that Algonquin has fully indemnified Aetna in the event Trafalgar challenges the sale.

In September, 1997, Aetna also decided to sell the "A" Note. Again, Aetna apparently engaged in private negotiations with Algonquin to purchase this Note and, on or about September 10, 1997 those parties arrived at an agreement whereby Algonquin would acquire the $6,700,000 "A" Note for the sum of $5,900,000. Again, paragraph 15 of the Loan Agreement gave Trafalgar a Right of First Refusal in connection with the "A" Note sale. Neither Aetna nor Algonquin, however, ever gave Trafalgar notice of the proposed sale, as had been done with the

proposed sale of the "B" Note, so that it could exercise its Right of First Refusal as required by the Agreement.

Trafalgar filed suit against Aetna and Algonquin (and related entities) on August 6, 1999 in the Northern District of New York claiming breach of contract and tortuous interference with contract, among other things, relating to the "A" and "B" Note transactions.

At about this time, Algonquin attempted to accelerate the balance due on those Notes by manufacturing a default under the loan agreements. The underlying motivation was to obtain the proceeds of the tort judgment obtained by Trafalgar (more than $10 million) and wrest definitive control and ownership of the projects from Trafalgar.

The circumstances surrounding the purported "default" on the payment of the "B" Note are as follows. In 1999, the Internal Revenue Service notified Steckler of a deficiency relating to the payment of payroll and income taxes by Marina, Trafalgar's parent, which were in part attributable to Trafalgar. Marina files a consolidated tax return for itself and its various subsidiaries, including Trafalgar.

The tax deficiency, which was in the amount of $197,092.56, was disputed by Marina, which was unable to resolve the matter with the IRS at that time. While Trafalgar had the funds necessary to pay this assessment from the revenue being generated by its hydro plants, it had no access to these revenues because they were controlled by Algonquin under the parties' management agreement, and Algonquin refused to allow Trafalgar to pay this assessment from that revenue. Eventually, the IRS issued a final notice of its intent to levy on Trafalgar's assets, not Marina's, because it had cash flowing from the hydro plants that could satisfy the levy.

It appears that Algonquin, when advised of the deficiency, paid the $197,092.56 IRS lien. From a review of the records produced in the subsequent litigation, it appears that Algonquin

paid the lien from the reserve account relating to Trafalgar's projects, just as Trafalgar originally requested that it be allowed to do and as Algonquin was required to do under the management agreement. Indeed, Trafalgar contends that the payroll taxes were those that were disclosed to Algonquin when it took over the management of the projects, and which were to be paid by Algonquin from funds provided as part of the restructuring of the debt with Aetna. Furthermore, a subsequent audit gave Marina credit for much of the income tax claimed in the lien.

Algonquin Power Income Fund, the alleged current holder of the "B" Note, however, used this alleged "default" by Trafalgar in failing to pay the IRS lien as a basis for accelerating the balance due on the project-related debt, including the "B" Note. Contending that this default triggered an acceleration of the balance of the debt due on the "B" Note, Algonquin claimed that the entire remaining obligation of approximately $17,000,000 was due and owing. Algonquin's motive in declaring the default and accelerating the debt was clearly to secure the proceeds of the judgment in the malpractice litigation.

On August 15, 1999, Algonquin commenced a separate proceeding against Trafalgar, Pine Run and others seeking to attach the judgment in the Stetson-Harza litigation, which Trafalgar had assigned to Pine Run. Magistrate Judge David R. Peebles, by Report, Recommendation and Order dated November 8, 1999, denied Algonquin's motion for an attachment, but granted its motion for a preliminary injunction. That decision was adopted for different reasons by Judge McCurn of the District Court, Northern District of New York, and the proceeds of the tort judgment are currently being held in escrow (the "Tort Proceedings Escrow") pursuant to the terms of a Stipulation and Order of the District Court of the Northern District of New York dated February 2, 2001. The two cases were consolidated and the parties commenced discovery. Trafalgar's Plan provides that it will commence an adversary proceeding

to determine the nature, extent and validity, if any, of Algonquin's claims to the Tort Proceedings Escrow proceeds (less and to be deducted therefrom the $2.75 Million that Algonquin will be claiming when the District Court litigation is concluded, as fully set forth in the New Hampshire settlement discussed below.)  Except with respect to the aforesaid $2.75 Million, Trafalgar does not believe Algonquin has any valid claim to those proceeds and expects to be successful in releasing those proceeds back to the Debtor.

After the bankruptcy filing, on August 29, 2001, the Debtors commenced five (5) separate but identical Adversary Proceedings (the "Adversary Proceedings") against Aetna and the various Algonquin entities, which included the claims interposed in 99-CV-1238, the New Hampshire Litigation (discussed below) and certain claims arising under the Bankruptcy Code.

Further, upon the recommendation of the Bankruptcy Court dated June 20, 2003, the District Court withdrew the reference with respect to certain causes of action alleged in the Adversary Proceedings, including those causes of action concerning Algonquin's acquisition of Trafalgar's debt to Aetna, which causes of action are also before the United States District Court in the Consolidated Action.  That litigation is currently in the discovery phase and is expected to continue for the next several years in the District Court.

Algonquin's management and control of the plants has continued for almost 10 years now.  They control every aspect of operations, including income and expenses.  The North Carolina Bankruptcy Court by Order dated October 3, 2001 allowed the management by Algonquin to continue over the Debtors' objection, but provided the "safeguard" that Mercer Construction Services LLC ("Mercer") act as a liaison between Algonquin and the Debtor.  By subsequent order dated November 7, 2001, the Court recognized that the issue of the assumption or rejection of the management contract with Algonquin could be revisited at the time of Plan

confirmation.  Debtor intends to reject that management contract in its entirety and substitute Mercer as full time manager, as discussed in Section IX below.

### F.    ALGONQUIN'S CLAIMS IN THE NEW HAMPSHIRE LITIGATION

On November 7, 2001, the North Carolina Bankruptcy Court issued an Order Granting Relief from the Automatic Stay in Franklin's case which permitted Algonquin to proceed in New Hampshire against Franklin.

Following the entry of the Order modifying the Automatic Stay, title to the New Hampshire Power Projects was transferred to Franklin Power, LLC, an Algonquin affiliate, pursuant to a New Hampshire foreclosure auction conducted by Algonquin Power Fund (Canada), Inc. ("APF"), on January 25, 2002 (the "Foreclosure Action").  Immediately prior to that scheduled sale date, Marina, Franklin and Steckler moved to enjoin the foreclosure auction. The request for an injunction was denied, and the sale proceeded as scheduled.

The New Hampshire Litigation challenging the sale above continued throughout 2002 and 2003, including counter-claims for a deficiency from the Foreclosure Action.  A Jury Trial in the New Hampshire Litigation began on June 21, 2004.

On June 30, 2004, the litigating parties, including Trafalgar, reached a settlement of the New Hampshire Litigation which was reduced to writing and entered as a Settlement Agreement and Order of the Merrimack County Superior Court for the State of New Hampshire on July 1, 2004 (the "Settlement Agreement").

Under the terms of the Settlement Agreement, the Settling Parties have agreed that, subject to this Court's approval, all claims and counter-claims pending in the New Hampshire Litigation will be dismissed, with prejudice, in exchange for a payment to APF from the Escrow Account in the amount of Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000),

without interest, upon the conclusion of the New York Litigation, and shall have priority over all other claims, including administrative claims. APF's right to receive $2,750,000 from the Escrow Account is not dependent upon the outcome of the New York Litigation. In the event, however, that APF and/or APIF prevail in the New York Litigation, the aggregate recovery of APF and APIF (not including the value of the New York collateral securing the note(s) held by APF and/or APIF) on account of all claims in the New Hampshire Litigation and the New York Litigation shall not exceed the total of the Escrow Funds at the time of the conclusion of the New York Litigation.

The Settlement Agreement was approved by this Bankruptcy Court by Order dated December 10, 2004.

### G.     CLAIMS AGAINST ALGONQUIN

With the exception of those particular claims that have settled with Algonquin in the New Hampshire Litigation, the Plan does not, in any manner, impair or waive any claims rights and/or causes of action the Debtor may have, now or in the future, against the Algonquin entities, including, but not limited to, those claims asserted in the Debtor's Adversary Proceedings, and the District Court litigation against Algonquin.

### IV.     MANAGEMENT SALARY

The Debtor, Trafalgar, currently does not pay any salary to its sole manager, Arthur Steckler, who is the President/Manager. It is anticipated that no management salaries will be paid during the life of the Chapter 11 Plan.

It should be noted that, while not employed by Trafalgar as internal management, Algonquin became the manager and operator of the hydro-electric projects prior to the bankruptcy filing under the terms of a management agreement dated January 15, 1996. That

management continued after the Chapter 11 filings. Algonquin is paid $12,500 per month. The Plan provides that this management contract be rejected in its entirety.

In the past, Mercer Construction Company, LLC, ("Mercer") has also been employed by the Debtor as a supervisor of the hydro-electric projects, and essentially reviews Algonquin's management and budgets in a very limited capacity. Mercer is receiving $7,500 per month for those services. The Debtor's Plan provides for Mercer to take over the operations and management of Trafalgar's 6 plants and the Christine Falls plant. Therefore, upon the rejection of the management contract with Algonquin, Trafalgar will enter into a new contract with Mercer and assume that contract under the terms of the Plan.

## V.    DEBTORS' FINANCIAL CONDITION

Attached hereto as Exhibit "A" are the Debtors' monthly cash flows for the years ending 2004 and the period ending August 23, 2005. These reports are broken down based on the 7 hydro electric power plants, including Christine Falls. The year ending 2004 demonstrates that the six (6) Trafalgar plants and the Christine Falls plants had approximately $1.5 Million in revenue, resulting in a net profit of $354,183 prior to debt service to the "B" Note Holder. For the period ending August, 2005, revenue was $1,167,005 resulting in a net profit of $328,491 prior to debt service to the "B" Note Holder. It is expected that the profitability of the operations continues into 2006.

## VI.    LIQUIDATION ANALYSIS

The Debtor believes that, once it is successful in defeating Algonquin's claims to the Tort Proceedings Escrow (minus the carve out of $2.75 Million) creditors would receive a 100% dividend in a liquidation. The liquidation analysis follows:

### Liquidation Analysis as of August 23, 2005:

**Assets**: -Hydro Electric Plants (includes Cranberry Lake,     $17,307,822 (book value)
Herkimer, Ogdensburg, Forestport, Adams, Kayuta Lake
& Christine Falls) (88.56%) (Book value as of 2000)

-Furniture and Supplies (amount unknown)     1

-Checking under control of Algonquin (JPMorgan Chase)
(6/7ths of account balance - excludes Christine Falls)*    862,052

-A/R under control of Algonquin    472,677
(estimated at time of filing- amounts unknown)

-Christine Falls stock    0

-Intercompany loan – Franklin Industrial Complex Inc.    0

-Claims for conversion against Algonquin
OB&G & Associated Electric of NA    1

-Claims against Algonquin/Aetna    1

Stetson-Harza Judgment proceeds    <u>7,000,000</u>

TOTAL ASSETS    <u>$25,786,227</u>

**Liabilities:**    Mortgage Debt "B" Note Holder (88.56%)    20,191,680
Of $22.8 Million

Administrative claims (post petition taxes due)    218,323

Priority Claims    191,423

Unsecured Claims (Excluding Insiders)**    <u>28,429</u>

TOTAL LIABILITIES    <u>$20,629,855</u>

*Funds to be used to reinstate the mortgage loan;

**does not include:  Ridgewood Heights Inc. Note payable of $11,914,960, Stever Properties or

Trafalgar Properties or Pine Run (insider claims)

## VII.    SUMMARY OF THE PLAN

Although a copy of the Plan is transmitted with the Disclosure Statement, a brief description of the Plan, classification and proposed treatment, follows:

Classifications:

**A:    Class I - Allowed Administrative Expenses:**

The allowed amounts of administrative expenses and priority obligations which qualify in accordance with §503 of the Code. These claims include the administrative claims of Harris Beach PLLC, counsel for the Debtor; the Court appointed accountant, J.D. Cox & Associates, Inc.; the Court appointed project supervisor, Mercer Construction Company LLC; the Court appointed forensic accountants, the Bonadio Group; and the United States Trustee's claims. The administrative expenses also include post-petition taxes owed to the New York State Department of Taxation and Finance.

**B:    Class II – Secured Claims:**

The allowed non-recourse secured claim of the "B" Note Holder which is (a) Algonquin and related entities, or (b) Trafalgar, which is secured by a mortgage and security agreement on Trafalgar's six (6) hydro-electric plants located in New York, located at or known as Cranberry Lake, Herkimer, Ogdensburg, Forestport, Adams, and Kayuta Lake. This claim is also secured by the plant owned by Christine Falls of New York, Inc. Trafalgar's portion of this debt is 88.56% and Christine Falls' portion is 11.44%.

The actual owner of the "B" Note will be determined in the District Court litigation outlined above. This claim, which Algonquin alleges has an approximate balance of $22.8 Million, will be reinstated in accordance with Section 1124(2). Algonquin alleges a reinstatement figure of $8.5 Million, which the Debtor disputes. Debtor will be filing an

objection to the claim including the reinstatement amounts owed, to have the amount of the claim and the reinstatement amounts determined by the Court.

Payment will be made to reinstate thirty (30) days after the last to occur of (a) final determination of the reinstatement amount by the Court; (b) release of the Tort Proceedings Escrow (minus the $2.75 Million); (c) the effective date of the Plan; and (d) a final determination of the District Court is made. In the event that the reinstatement amount is greater than the funds available in the JPMorgan Chase account, discussed below, Debtor will elect to sell the property or encroach upon the $7 Million Tort Proceedings Escrow once it is released.

If reinstatement is effectuated, the reinstatement funds will be held in escrow on behalf of the "B" Note Holder until the District Court litigation is resolved and the true owner of the "B" Note is determined. All future monthly payments on the claim will be paid in accordance with the underlying loan documents from ongoing operations and will be held in escrow as well.

## C.     Class III – Priority Claims:

The allowed priority claimants who would have filed Proofs of Claim or who appeared in the original schedules as undisputed and uncontingent shall be paid in full with 6% interest throughout the duration of the Chapter 11 Plan of Reorganization. These claims are outlined in Exhibit "B" attached hereto. The estimated amount of the priority claims are $215,590.24. This class includes the claims of the Internal Revenue Service ($24,166.54) and the New York State Department of Taxation and Finance (two claims totaling $191,423.70).

The Debtor does not believe there are any amounts owed to the real property taxing authorities, and that any amounts owed pre-petition were paid in the ordinary course of business. Therefore there will not be payments made to: Adams Center Tax Collector, Boonville Tax Collector, City of Ogdensburg, Village of Herkimer, and Oswegatchie Reservoir.

**D.     Class IV – General Unsecured Claims:**

The general unsecured claimants that have filed allowed Proofs of Claim or who have appeared in the original schedules as undisputed and uncontingent claims shall be paid a 100% dividend with 4% interest calculated from the effective date of confirmation.  The following is the list of the only unsecured claimants that will be paid:  Jonathan Chait, CT Corp., State Street Bank and Sears Roebuck and Co.  Total unsecured claims are $28,429.22.

It is anticipated that all payments made under the terms of the Plan be made over  the 24 month term of the plan.

The following insider claims will not receive a distribution under the Plan but they will be equitably subordinated:

Ridgewood Heights        $11,914,960.09
Stever Properties            $15,199.55
Trafalgar Properties        $35,000.00

These claimants will <u>not</u> receive a distribution on account of their claims during the pendency of the Plan, but will <u>not</u> be deemed discharged upon confirmation of the Plan.

A potential unsecured claim of an insider, Pine Run, will be accorded the same treatment as the insider claims identified above.

**E.     Class V – Equity Security Holders:**

The claim of the sole shareholder, Marina Development, Inc., shall not be paid under the terms of the Plan.  Marina will not need to infuse any funds into Trafalgar upon confirmation of the Plan as all creditors will be paid 100% of their claims with interest.  Once all payments are made and the Plan is successfully completed, the stock will vest with Marina, which will retain its 100% equity ownership in Trafalgar.

## Cash Required for Distribution:

As of August 23, 2005, there is approximately $1 Million accumulated in the Debtors'
JPMorgan Chase checking account (under the control of the Algonquin management company).
The Plan calls for an initial payment to reinstate the secured claim to the "B" Note Holder under
§1124(2).  The amount of this payment will be determined by the Court.  This payment will be
paid out of the cash accumulated in the JP Morgan Chase account and any additional funds that
have accumulated until the time of confirmation.  In the event the reinstatement amount is
greater than the funds available, Debtor will elect to sell the property or encroach upon the $7
Million escrowed funds once they are released.  The Plan also calls for payments to Harris Beach
PLLC, counsel for the Debtor, J.D. Cox & Associates, accountant, and the Bonadio Group, for
forensic accountant professional fees and costs after proper application and approval by the
Bankruptcy Court.  These lump sum payments, anticipated to be approximately $300,000 in
total, will be paid out of the Debtors' JPMorgan Chase checking account or from escrowed
funds.

The Internal Revenue Service and New York State will also be paid on their
administrative claims, if any, at the time of confirmation.  Debtor believes it owes approximately
$218,323.00 to the New York State for 2001 through 2004 taxes and that nothing is owed to the
Internal Revenue Service for post-petition taxes.  The New York State amounts will also be paid
out of the $1 Million in the Debtor's JPMorgan Chase bank account.

The payments under the terms of the Plan are as follows:  (A) Secured Creditor, after the
initial reinstatement, shall be paid in monthly payments in accordance with its underlying loan
document; Priority Claims to New York State of $8,484.02 per month over 24 months, and

Unsecured Creditor Payments of $1,234.12 per month over 24 months. The priority and unsecured creditors and the balance of the monthly payments to the "B" Note Holder after reinstatement will be generated from ongoing business operations of the Debtor. See, Exh. "A."

### Preferential Payments/Fraudulent Transfer Analysis:

Prior to the Petition Date, the Debtor made many payments to its creditors in the ordinary course of its business. The Debtor believes that most of these transfers were made in the ordinary course as payment of debts incurred by the Debtor in the ordinary course of business or financial affairs of the Debtors and the transferee, and were made according to ordinary business terms. Therefore, the Debtor does not believe that most of these payments are voidable preferences under 11 U.S.C. §547.

The Debtor does not believe that most of these payments constitute fraudulent transfers and obligations under 11 U.S.C. §548. Most of the payments made in the ordinary course of business were not made or incurred with the actual intent to hinder, delay or defraud any entity to which the Debtor was or became due, on or after the date that such transfer was made or such obligation was incurred. Furthermore, the Debtor believes it received a reasonable equivalent value in exchange for the transfer of obligation with respect to the products or services provided by the respective vendors.

The exception to the above analysis involves the Algonquin entities. The Debtor is currently reviewing payments made to the Algonquin entities in the context of the District Court litigation. Debtor reserves all rights to allege preference and fraudulent conveyance causes of action against the Algonquin entities for both pre and post-petition transactions.

## VIII.   EXECUTORY CONTRACTS / UNEXPIRED LEASES

Annexed hereto as Exhibit "B" is a list of executory contracts and unexpired leases that exist as of the date of the Disclosure Statement, and the Debtors' intention regarding those contracts. Debtor intends to assume the leases with Oswegatchie River, Cranberry Reservoir and the City of Ogdensburg, and upon information and belief, is current with those leases. If there are any arrears due, they shall be paid upon confirmation from the accumulated funds in the JP Morgan Chase account. Debtor intends to assume the executory contracts with Niagara Mohawk (if any).

The Debtor also intends to reject the management agreement dated January 15, 1996 with Algonquin Power Corp., Inc., based on its best business judgment.

The Debtor verily believes that no contract or other agreement exists with Hydro Investors, Inc. based on the prior Court proceedings outlined above and the numerous rejections of their claims. Nevertheless, HII continues to assert, in serial fashion, an interest in the projects owned by Trafalgar and Christine Falls. In the unlikely event that any subsequent proceedings determine that there exists such a claim, the Debtor hereby rejects any underlying contract(s) and agreement(s) in their entirety.

## IX.     ELEMENTS OF CONFIRMATION PURSUANT TO 11 U.S.C. §1129(A)

It is the Debtor's belief that all of the requirements for confirmation of the Plan as provided for in §1129(a) of the Code, either have been or will be met prior to a hearing and confirmation of the Plan. Such requirements have been met or will be met as follows:

**Section 1129(a)(1):**

The Debtor has been advised by its counsel that the proposed Plan complies with the applicable provisions of Chapter 11.

**Section 1129(a)(2):**

The Debtor as proponent of the Plan, has complied with all applicable provisions of Chapter 11 in proposing the Plan.

**Section 1129(a)(3):**

The Debtor is proposing the Plan in good faith and not by any means forbidden by Law.

**Section 1129(a)(4):**

The Debtor has disclosed all payments previously made for services or for costs and expenses in this case, in its petition, and its applications for fees, and all applications for further fees for professional services rendered by Debtor's attorneys shall be submitted to the Court for Court approval as being reasonable.

**Section 1129(a)(5):**

The Debtor, as proponent of the Plan, has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor and has also disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, with the nature of any compensation for such insider.

**Section 1129(a)(6):**

To the best of the Debtor's knowledge, the plan does not provide for any rate change. Therefore, the approval of the agency or regulatory commission with jurisdiction over rates and charges by the Debtor is not required.  If it is determined that any such rate changes exist, approval of the agency or regulatory commission would be obtained prior to confirmation.

**Section 1129(a)(7):**

The Debtor believes that all impaired classes will accept the Plan and that each holder of a claim of each Class will accept the Plan. All impaired creditors will receive at least as much under the Plan as they would in liquidation under Chapter 7 of the Code.

**Section 1129(a)(8):**

As stated above, the Debtor is optimistic that each Class will accept the Plan. If any impaired Class does not accept the Plan prior to the confirmation date, the Debtor intends to move for the application of §1129(b) with respect to any Class of claims not accepting the Plan.

**Section 1129(a)(9):**

The Plan treats holders of claims specified in §507(a)(1-7) as required.

**Section 1129(a)(10):**

The Debtor believes that at least one Class will accept the Plan.

**Section 1129(a)(11):**

Confirmation of the proposed Plan is not likely to be followed by a further reorganization of the Debtor.

**Section 1129(a)(12):**

All fees payable under 28 U.S.C.§1930, (i.e. filing fees and/or U.S. Trustee fees) as determined by the Court at the hearing on confirmation of the Plan, will have been paid by the Debtor by effective date of the Plan.

**Section 1129(a)(13):**

The Debtor-in-Possession has not maintained a retiree benefit Plan pre-petition.

## X.    CONCLUSION

The Debtor-In-Possession strongly urges that all creditors accept the proposed Plan.

Dated: January 5 , 2006

_Wendy A. Kinsella_
Wendy A. Kinsella, Esq. (Bar Roll No. 508699)
HARRIS BEACH PLLC
One Park Place, 4th Floor
300 South State Street
Syracuse, NY  13202
Telephone:  (315) 423-7100


TRAFALGAR POWER, INC.

By:  Arthur Steckler, President