UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

| | |
|---|---|
| FRANKLIN INDUSTRIAL COMPLEX, INC. | CASE NO. 01-67459 |
| | Chapter 11 |
| Debtor | Jointly Administered |

--------------------------------------------------------
IN RE:

| | |
|---|---|
| CHRISTINE FALLS OF NEW YORK, INC. | CASE NO. 01-67458 |
| Debtor | |

--------------------------------------------------------
IN RE:

| | |
|---|---|
| TRAFALGAR POWER, INC. | CASE NO. 01-67457 |
| | (Main Case) |
| Debtor | |

--------------------------------------------------------
APPEARANCES:

| | |
|---|---|
| HARRIS BEACH PLLC | WENDY A. KINSELLA, ESQ. |
| Attorneys for Debtors | DAVID M. CAPRIOTTI, ESQ. |
| One Park Place, 4th Floor | Of Counsel |
| 300 South Stat e Street | |
| Syracuse, New York 13202 | |
| | |
| MENTER, RUDIN & TRIVELPIECE, P.C. | JEFFREY A. DOVE, ESQ. |
| Attorneys for Algonquin Power Corporation, Inc. | Of Counsel |
| 308 Maltbie Street, Suite 200 | |
| Syracuse, New York 13204-1498 | |
| | |
| MORGAN LAW FIRM, P.C. | WILLIAM R. MORGAN, ESQ. |
| Attorney for Hydro Investors, Inc. | Of Counsel |
| 120 East Washington Street, Suite 721 | |
| Syracuse, New York 13202 | |
| | |
| GREEN & SEIFTER, PLLC | ROBERT K. WEILER, ESQ. |
| Attorneys for Ridgewood Heights, Inc. | Of Counsel |
| One Lincoln Center, Suite 900 | |
| 110 West Fayette Street | |
| Syracuse, New York 13202 | |

AMY F. QUANDT, ESQ.

Trial Attorney, U.S. Trustee
10 Broad Street
Utica, New York 13501

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

Under consideration by the Court is a motion filed on November 12, 2007 (the "Motion"), on behalf of Algonquin Power Income Fund ("APIF"), seeking allowance of a "superpriority" administrative expense claim in the amount of $10 million pursuant to §§ 503(b)(1)(A) and 507(b) of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1532 ("Code"). Opposition to the Motion was filed on behalf of Christine Falls of New York, Inc. ("CFC"), Franklin Industrial Complex, Inc. and Trafalgar Power Inc. ("TPI") (collectively the "Debtors") on December 13, 2007.

Although originally scheduled to be heard on November 27, 2007, at the Court's regular motion term in Utica, New York, the Motion was adjourned to December 18, 2007. Following oral argument that day, the Motion was again adjourned to January 29, 2008. On January 24, 2008, Marina Development, Inc., Ridgewood Heights, Inc., Stever Properties, LLC, and Trafalgar Properties, LLC joined in the Debtors' objection to the Motion.[1]

Following oral argument on January 29, 2008, the Court indicated that it would take the Motion under submission and allowed the parties an opportunity to file additional memoranda of law. The matter was finally submitted for decision on February 25, 2008.

---

[1] Marina Development, Inc. is the Debtors' corporate parent. It originally filed a chapter 11 petition, along with the Debtors. Its case was severed from those of the other Debtors and dismissed without prejudice on December 22, 2005. The other three entities are Debtors' affiliates and insiders and were listed in TPI's petition as holders of unsecured claims.

3

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), (b)(2)(A), (B) and (O).

## FACTUAL BACKGROUND

In the latter half of 1988 Aetna Life Insurance Co. ("Aetna") financed TPI's construction of seven hydroelectric power plants in New York State ("Power Projects") with a loan in the principal amount of $22,500,000. TPI pledged substantially all of its assets, including the Power Projects, as collateral for the loan. Eventually, TPI defaulted on the loan and on January 19, 1995, Aetna notified TPI of the default and its intent to accelerate the entire balance immediately due and to foreclose on the collateral. At that time, the entire principal amount of $22,500,000 was still owed, as well as $10,199,659.50 in accrued interest.

On or about January 15, 1996, Aetna, TPI and CFC agreed to restructure the 1988 loan agreements, and the debt was restructured into a $6.7 million "A" Note and a $15.8 million "B" Note. In connection with the negotiations, Aetna also required that TPI hire an operator/manager for the Power Projects as a pre-condition to any restructured loan. Accordingly, TPI hired Algonquin Power Systems, Inc. ("APS") to operate and manage the Power Projects. As best the Court can determine from various pleadings, ultimately, Aetna sold the "B" Note, which is secured by a mortgage on the premises on which the Power Projects operate, to Algonquin Power U.S. Holdings, Inc. in early 1997, which in turn transferred all of its right and interest in the "B" Note to APIF on

or about October 8, 1997. In September 1997, Aetna and Algonquin Power Corporation, Inc. ("APC")[2] agreed upon terms for the purchase of the "A" Note by Algonquin Power Fund (Canada), Inc., as well.

On August 27, 2001, the Debtors filed voluntary petitions pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Eastern District of North Carolina ("North Carolina Bankruptcy Court") (Case Nos. 01-02452 - 01-02454). The cases, including that of Marina Development, Inc. and Pine Run of Virginia, Inc. (Case Nos. 01-02451 and 01-02455, respectively) were consolidated by Order dated September 7, 2001 and later transferred to this Court on or about December 26, 2001. The "A" Note was paid in full prior to the filing of the Debtors' petition. As of the petition date, APIF alleges an outstanding balance due on the "B" Note of approximately $18.8 million.

On August 27, 2001, the Debtors filed an emergency motion for authority to use cash collateral in exchange for providing adequate protection to APIF ("Cash Collateral Motion"). In their Cash Collateral Motion, the Debtors disputed the secured status of APIF. Nonetheless, they indicated that "[t]he continued operations of the business of each Debtor is dependant upon its ability to purchase supplies, to pay wages to its employees, and to pay the other costs associated with their business operations. * * * Debtors believe that the continued operations and maintenance of the Projects by Mercer,[3] an independent professional, pursuant to Court approved budgets

---

[2] As best the Court can determine, APC acts as the agent for both APIF and Algonquin Power Fund (Canada).

[3] On August 27, 2001, the Debtors also filed a motion for authority to employ Mercer Construction Co., LLC to manage and operate the Debtors' hydroelectric facilities in New Hampshire and New York (Dkt. No. 5). In addition, they sought authority to reject the executory contract with APS with respect to both the New Hampshire and New York facilities (Dkt. Nos. 6

5

provides sufficient adequate protection under the circumstances of these cases to the disputed secured interests of Algonquin Power." Debtors' Cash Collateral Motion (Dkt. No. 8)[4] at 4, ¶¶ 18 and 20.

In response to the Debtors' Cash Collateral Motion pursuant to Code § 363, on October 22, 2001, the North Carolina Bankruptcy Court issued an Order ("October 2001 Order"), which provided:

> To adequately protect Algonquin Power Income Fund, and to the extent it is determined that Algonquin Power Systems, Inc. holds a valid lien or security interest, Algonquin Power Systems, Inc., in connection with the Debtors' use of Cash Collateral and any other property which the Debtors previously granted Algonquin Power Income Fund security interests and liens, or in which Algonquin Power Systems, Inc. is determined to have such an interest, the Debtors hereby grant, assign and pledge to Algonquin Power Income Fund and Algonquin Power Systems, Inc. a post-petition replacement security interest and lien (of the same validity, extent and priority as Algonquin Power Income Funds' respective pre-petition security interests in the Pre-Petition Collateral in and to: (a) the Pre-Petition Collateral; (b) all proceeds from the disposition of the Pre-Petition Collateral, including Cash Collateral; (c) any assets or properties of the same type and description as the Pre-Petition Collateral generated or acquired by the Debtors after the Petition Date ((a), (b) and (c) above being referred to herein as the "Post-Petition Collateral"), and (d) all proceeds of the Post-Petition Collateral.

*See* October 2001 Order at ¶ 3 of "Wherefore Clause," pp. 5-6, attached as Exhibit "A" of the Motion.

In the October 2001 Order it is noted that the

Debtors rely on the granting of a replacement lien, plus the maintenance of

---

and 7). On November 7, 2001, the North Carolina Bankruptcy Court denied the rejection of the executory contract, as well as the employment of a new manager, deferring final decision until the hearing on confirmation of the Debtors' chapter 11 plan of reorganization (Dkt. No. 124).

[4] Reference to "docket numbers" includes TPI's case (Case No. 01-02452) until September 7, 2001, when it was consolidated with Marina Development's case (Case No. 01-02455) and later transferred to this Court on December 26, 2001. Following Marina Development's dismissal on December 22, 2005, reference to "docket numbers" is in the case of TPI, namely Case No. 01-67457.

6

>insurance, the continued protection of collateral, and the operation of the New York Projects by Algonquin Power Systems, Inc., the secured creditors' affiliate, which shall exercise its management duties as a fiduciary to the bankruptcy estates, to provide adequate protection to Algonquin Power Income Fund and contingently to Algonquin Power Systems, Inc. [collectively "Algonquin"], regarding Debtors' use of Cash Collateral.

*See* October 2001 Order at 3-4, ¶ H.

There is no dispute that the terms of the October 2001 Order have been reaffirmed in a series of 40 subsequent interim cash collateral stipulations and orders.[5]

In the interim, on September 21, 2001, APC, Algonquin Power Fund (Canada), Inc. and APIF (collectively the "Algonquin entities") filed a motion to dismiss the Debtors' cases or in the alternative, for an Order terminating the automatic stay pursuant to Code § 362(d)(1) and (2) (Dkt. No. 44). In their motion pursuant to Code § 362(d)(1), the Algonquin entities alleged that "cause" existed to lift the stay based on what they alleged was bad faith on the part of the Debtors in filing their petitions. Pursuant to Code § 362(d)(2), the Algonquin entities argued that the Debtors lacked any equity in the collateral securing APIF's claim based on the information set forth in the Debtors' schedules.

On November 7, 2001, the North Carolina Bankruptcy Court denied the Algonquin entities' motion to dismiss the Debtors' cases and, alternatively, their motion for relief from the automatic stay "to continue with litigation pending in other jurisdictions." (Dkt. No. 125). According to the Debtors, if granted, the latter would have allowed, *inter alia*, Algonquin to proceed "with its judicial

---

[5] At the time of the Motion, the Court had approved the Thirty-Fifth Extension of Debtors' Interim Limited Authority to Use Cash Collateral and Provide Adequate Protection on November 14, 2007 (Dkt. No. 304). Most recently, on March 12, 2008, the Court approved the Thirty-Sixth Extension (Dkt. No. 387) on May 2, 2008, the Thirty-Seventh, Thirty-Eighth and Thirty-Ninth Extensions (Dkt. Nos. 420-422) and on July 18, 2008, the Fortieth Extension (Dkt. No. 448).

7

foreclosure upon the assets of Trafalgar and Christine Falls . . . ." (Exhibit "A" at ¶ 7, attached to APIF's Memorandum of Law (Dkt. No. 369), i.e. Debtors' Response to the Algonquin entities' Motion to Dismiss Cases. According to the November 7, 2001 Order, the Algonquin entities had failed to meet their burden of establishing that the Debtors lacked equity in the property at issue pursuant to Code § 362(g). No where in either motion or the Order is there any discussion of the actual value of the Power Projects, however.

During the proceedings in this Court, as well as in the United States District Court for the Northern District of New York ("District Court") (Civil Action No. 5:99-CV-1238 and Civil Action No. 5:00-CV-1246, consolidated), the parties apparently have provided various estimates on the value of the Power Projects. For example, in the Supplemental Affidavit of David Kerr ("Kerr"), Secretary of APC, as well as an officer of APS, sworn to on October 7, 2000 (Dkt. No. 26 in the District Court Civil Action 5:00-CV-1246), he presented a comparison of an appraisal performed by Pomeroy Appraisal Associates, Inc. in 1989 allegedly at the request of Arthur Steckler, the sole shareholder of TPI and CFC, which estimated a value of the six Power Projects located in New York to be $14,350,000 as of August 11, 1989, with an appraisal allegedly prepared by David Peatfield in 1995 and submitted by TPI in connection with the litigation in the District Court, which estimated a fair market value of $29,150,000 as of January 1, 1989. *See* Exhibit "H" at ¶¶ 17-18, attached to Debtors' Memorandum of Law, dated December 13, 2007 (Dkt. No. 318) According to Kerr, neither appraisal had bearing "on the present value of the plants as best reflected by the restructuring by Aetna in 1996 when it wrote off more than $12,000,000 in accumulated interest owed by TPI. . . . Because the rates and expectations in 1989 were significantly greater than current projections, the value of the facilities has declined dramatically." *Id.* at ¶¶ 17 and 20. He stated that it was

8

anticipated that "[b]eginning January 2001, projected plant revenues will decline rapidly" as a result of a decline in the rates paid for the energy they produce of approximately 83%. *Id.* at ¶ 15. Kerr opined that "there will be few, if any, payments made toward the B Note beginning in 2001 through the due date of December 31, 2010." *Id.* Kerr goes on to state that "[b]ased on current forecast rates, the value of these facilities is in the range of $4.1 Million . . . ." *Id.* at ¶ 22. However, in August 2001, when they filed these bankruptcy cases, the Debtors estimated a value of the Power Projects to be $17.3 million as of August 2000. *See* Schedule A, attached to TPI's petition. Most recently Federal Appraisal & Consulting LLC, appointed at the request of the Debtors, issued a preliminary report allegedly determining that the Power Projects had a value of $8.1 million as of April 1, 2006.

## DISCUSSION

> Code § 507(b) provides that
>
> [i]f the trustee [or debtor in possession], under section 362, 363 or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title . . . then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b).

Code § 507(b) is to be narrowly construed and it is the creditor asserting such a claim that must establish that (1) the trustee [or debtor in possession] provided adequate protection of the interest of the creditor prior to the current motion, (2) notwithstanding the adequate protection, the

9

creditor has a claim allowable under Code § 507(a)(2), which references Code § 503(b), and (3) that claim must have arisen from either the stay of action against the property pursuant to Code § 362 or from the use, sale, or lease of the property pursuant to Code § 363. *See In re Beam*, Case No. 97-82752, 1998 WL 34065297 at *5 (Bankr. C.D. Ill. Sept. 23, 1998); *In re Five Star Partners, L.P.*, 193 B.R. 603, 609 (Bankr. N.D.Ga. 1996).

Contrary to the Debtors' assertion that APIF has not sought relief from the automatic stay, the Court notes that such a motion was filed by APIF and other Algonquin entities on September 21, 2001, as indicated. In their motion for relief from the automatic stay pursuant to Code § 362(d)(1), the Algonquin entities argued that "cause" existed to lift the stay based on what they alleged was bad faith on the part of the Debtors in filing their petitions. Their motion, which was denied by the North Carolina Bankruptcy Court on November 7, 2001, makes no mention of a lack of adequate protection, and no award of adequate protection was ordered.

However, the North Carolina Bankruptcy Court did award adequate protection to APIF in October 2001 in connection with the Debtors' Cash Collateral Motion. In their Cash Collateral Motion, the Debtors expressed their belief that the continued operation and maintenance of the Power Projects would provide sufficient adequate protection of APIF's alleged security interest. To this end, the October 2001 Order stated that in connection with the Debtors' use of cash collateral "and any other property [in] which the Debtors previously granted Algonquin Power Income Fund security interests and liens," a postpetition replacement security interest and lien was granted in the prepetition collateral and any proceeds from the disposition of the prepetition collateral. Thus, adequate protection was provided to APIF at least with respect to the Debtors' use of cash collateral to maintain and operate the Power Projects.

10

The Debtors argue that while they have used APIF's cash collateral since 2001, they have not had "use" of the Power Projects because those Projects have been managed by APS. Thus, the Debtors take the position that no adequate protection was awarded with respect to the Power Projects, only with respect to the use of cash collateral.

The Court cannot accept this argument and the distinction the Debtors wish it to draw. The income generated from the Power Projects these past seven years has been applied to the Debtors' obligations to APIF, particularly with regard to the "B" Note, which is secured by a mortgage on the premises on which the seven hydroelectric power plants operate. The very nature of the Debtors' request for the use of cash collateral has been to support the continued maintenance and operation of the Power Projects. "'That which is actually utilized by a [debtor-in-possession] in the operation of a debtor's business is a necessary cost and expense of preserving the estate and should be accorded the priority of an administrative expense.'" *Id.* at 613, quoting *In re Subscription Television of Greater Atlanta*, 789 F.2d 1530, 1532 (11th Cir. 1986).

In *Five Stars Partners*, the debtor held title to a parcel of real property with the intent to enhance the value of an adjacent larger tract of land on which a hotel was located by selling both together. *Id.* at 613. The court determined that the debtor, simply in holding the property, had never physically used or derived a benefit from it. *Id.* at 614 (noting that "the anticipated benefit proved to be ephemeral, even though the Debtor believed its holding of that property would confer a benefit on the estate"). Accordingly, the court denied the Code § 507(b) motion filed by the creditor.

In the matter presently under consideration by this Court, the Power Projects are apparently operational and continue to generate power, which, in turn, provide a benefit to the Debtors' estates. The Court must conclude that the Power Projects are being "used" by the Debtors for the benefit of

the estate and that adequate protection was awarded in connection with that use, beginning with the October 2001 Order. Thus, APIF has established the first and second factors required pursuant to Code § 507(b). *See J.F.K. Acquisitions Group,* 166 B.R. 207, 212 (Bankr. E.D.N.Y 1994).

There still remains the third hurdle that APIF must clear before being granted superpriority status. Code § 507(b) requires that APIF establish that its alleged loss and what it argues to be the failure of the adequate protection awarded since October 2001, is attributable to the Debtors' use of the Power Projects pursuant to Code § 363. "[T]he logical measure of the claim is the loss in value attributable to the [Debtors'] use of the property." *Beam*. 1998 WL 34065297 at *6, citing to 4 COLLIER ON BANKRUPTCY ¶ 507.12[1][c] (15th ed. 1997) .

In this case, APIF contends that the Debtors should be bound by their prior assertions in the District Court that the value of the Power Projects as of January 1, 1989, was approximately $29,150,000, based on Peatfield's 1995 appraisal (*see Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F.Supp.2d 341, 352 (N.D.N.Y. Jan. 16, 2001)), or by the value set forth in Schedule A of TPI's petition, filed August 27, 2001, of $17,307,833. *See* Schedule A, attached to TPI's petition. Even if the Court were to accept either of those values, it still cannot ignore the sworn statements made by Kerr in the District Court in which he opined that the value of the Power Projects was expected to decline as a result of the drop in rates for the electrical power being generated at the facilities, beginning in January 2001.

Superpriority status is warranted only if the adequate protection previously granted fails. As one court has noted in *dicta*, adequate protection is

> based on difficult and easily variable valuations of property, and from their overriding importance to the protection of secured creditors. The valuation of lost opportunity cost is a fact-specific finding, dependent upon the valuation of collateral in issue, assessing the consequences under state law if the lender were to institute foreclosure

12

. . . .

*In re Timbers of Inwood Forest Assocs. Ltd.*, 808 F.2d 363 (5th Cir. 1997) (dissent in a 10-5 *en banc* decision), *majority aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365 (1988), *Id.* at 381, n.9. In order to be granted a superpriority claim with respect to the Power Projects, any decline in their value must have been unanticipated. "[L]osses that would have occurred despite the interference of the bankruptcy case are not entitled to protection under § 507(b)." *In re Mendez*, 259 B.R. 754, 758 (Bankr. M.D.Fla. 2001); *see generally In re Second Timmon Hotel Co., Ltd.*, 91 B.R. 985, 988 (Bankr. M.D.Fla. 1988) (noting that "[i]n order for a creditor to sustain a claim under § 507(b), it must prove that the loss was caused solely by the imposition of the automatic stay"). The Debtors filed their petitions on August 31, 2001, and identified an estimated value for the Power Projects as of August 2000 to be $17,307.833. There is nothing before the Court to indicate the actual value of the Power Projects in October 2001 when the North Carolina Bankruptcy Court awarded APIF adequate protection. While APIF argues that the value of the Power Projects has decreased significantly since October 2001, if the most recent appraisal by Federal Appraisal & Consulting LLC is to be given credence, the value of the Power Projects has actually increased from that anticipated by Kerr in 2001 of $4.1 million to $8.1 million as of April 1, 2006.

While there has been reference made to several appraisals over the years, as far as the Court is able to determine, none have been admitted into evidence in the course of an evidentiary hearing, subject to cross-examination by the respective parties. The District Court found that TPI had met its burden of establishing its solvency when it provided an appraisal estimating a value of $29,150,000 as of January 1, 1989. *See Trafalgar Power, Inc.*, 131 F.Supp.2d at 351. The District Court also

13

determined that APIF had failed to establish that TPI had been rendered insolvent when it assigned a $7.6 million judgment to Pine Run Virginia, Inc. in 1999. *Id.* Nor does it appear that the value of the Power Projects in 2001 was an issue when the North Carolina Bankruptcy Court made its initial award of adequate protection in connection with the Debtors' request for authorization to use cash collateral. The important consideration from the Debtors' standpoint at that time was that they be allowed to use monies being generated by the Power Projects to continue their operation, albeit under APS's management. In addition, there has been no valuation by this Court regarding the Power Projects. Without such a determination, it is difficult for the Court to find that the awards of adequate protection in the form of rollover liens in the prepetition collateral, including the Power Projects, and the proceeds generated from the collateral, have proven to be inadequate these past seven years based on the allegations made by APIF in the present motion.

In addition, the Court notes that there is a reluctance to grant superpriority status if the claimed losses were occasioned by the creditor's own conduct. *Mendez,* 259 B.R. at 758; *Timmon Hotel*, 91 B.R. at 988. In this case, it is APS that has continued to manage the Power Projects. Whether any decline in the value of the Power Projects is, in part, attributable to its mismanagement, as alleged by the Debtors, is not something the Court need consider at this juncture, particularly in the absence of an evidentiary hearing.[6] Accordingly, the Court concludes that on this record APIF has failed to satisfy the third factor with respect to Code § 507(b).

Based on the foregoing, it is hereby

ORDERED that based on the current record before the Court, APIF's motion seeking

---

[6] Allegations of prepetition mismanagement of the Power Projects by APS are currently pending in the District Court.

14

allowance of a superpriority administrative expense claim pursuant to Code §§ 503(b)(1)(A) and 507(b) in the amount of $10 million is denied without prejudice.[7]

IT IS SO ORDERED.

Dated at Utica, New York

this 21st day of August 2008

/s/   Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge

---

[7] APIF's counsel indicates that it "is prepared to conduct discovery and prosecute an evidentiary hearing to establish the factual basis for its entitlement to a super-priority claim." *See* APIF's Memorandum of Law, filed February 25, 2008, at 8, n.3.