# AMENDED EXHIBIT "A"

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is executed as of this ____ day of ___, 2014 (the "Effective Date") by and between **TRAFALGAR POWER, INC., ("TPI") AND CHRISTINE FALLS OF NEW YORK, INC.** ("CFC"), a New York corporation, (collectively, the "Sellers", and each individually, a "Seller"), and **[STALKING HORSE]**, a [legal form] ("Purchaser"; and collectively with the Sellers, the "Parties").

## RECITALS

A.      The Sellers filed voluntary petitions under the Bankruptcy Code for relief under Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of North Carolina on August 27, 2001 (the "Filing Date").  By Order transferring venue dated December 13, 2001, the venue of the Debtor's cases was transferred to the Northern District of New York where the cases have remained (the "Bankruptcy Court").

B.      TPI owns six (6) hydroelectric power facilities: (i) Ogdensburg, (ii) Forestport, (iii) Adams, (iv) Kayuta Lake, (v) Cranberry Lake, and (vi) Herkimer.

C.      CFC is a wholly owned subsidiary of TPI which owns one hydroelectric power facility: Christine Falls.

D.      The Facilities have been operated pursuant to a Management Agreement with Algonquin Power Corporation, Inc. ("APC"), which has subcontracted its duties thereunder to Algonquin Power Systems New York, Inc. ("APSNY" and, together with APC, "Algonquin").

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and adequacy are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

## ARTICLE I

## THE ACQUIRED ASSETS

**Section 1.1  Purchase and Sale of Property**. Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, upon the terms and subject to the satisfaction or waiver of the conditions hereinafter set forth (including, without limitation, the entry of the Sale Procedures Order and the Sale Order (each as hereinafter defined)), the property and assets set forth in this Section 1.1, but expressly excluding the Excluded Property (collectively, the "Acquired Assets"):

(a)      Facilities.  The TPI Facilities located at: (i) Ogdensburg, (ii) Forestport, (iii) Adams, (iv) Kayuta Lake, (v) Cranberry Lake, and (vi) Herkimer; along with the real

1

estate for the Adams, Forestport, Kayuta Lake and Herkimer Facilities (the "TPI Facilities") (excluding the leased real estate on which the Ogdensburg and Cranberry Lake Facilities operate).

(b)      The Facility and the real estate upon which Christine Falls is operated (the "CFC Facility", together with the TPI Facilities are the "Facilities");

(c)      Improvements.  Any and all buildings, structures, and other improvements of every kind located on or affixed to the land upon which the Facilities are located (the "Buildings"), and all other structures, systems, fixtures and utilities affixed to the Facilities (including, without limitation, the electrical, plumbing, heating, air conditioning, and environmental remediation systems associated with and utilized by Sellers in the ownership and operation of the Buildings) (the Buildings and all of such improvements being herein collectively called the "Improvements");

(d)      Appurtenant Rights.     Any easements, rights-of-way, tenements, hereditaments, appurtenances, licenses, rights and privileges thereto belonging or in any way appertaining to the Facilities, and all of Sellers' right, title and interest in and to the land lying in the bed of any street, alley, road or avenue, open or proposed, in front of, abutting or adjoining the Facilities, including all strips and gores adjacent to the Facilities (collectively, the "Easements and Ownership Rights", and together with the Facilities  and the Improvements the "Real Property");

(e)      FF&E.  All right, title and interest of Sellers, in and to all fixtures, furniture, furnishings, equipment, including turbine and generators, and other items of property which are owned by Sellers, or are located at the Facilities or are used in the operation of the Facilities including, but not limited to, the items listed on **Schedule 1.1(e)** (the "FF&E")

(f)      Supplies.  All right, title and interest of Sellers in and to (i) all supplies that are located at the Facilities; (ii) all spare parts and ancillary maintenance tools which are located at the Facilities; and (iii) all inventory located at the Facilities (together, the "Supplies") including, but not limited to, the items listed on **Schedule 1.1(f)**; but excluding items listed on **Schedule 1.1(f)(i)**;

(g)      IT Systems.  All right, title and interest of Sellers in and to all computer hardware, telecommunications and information technology systems located at the Facilities, and all computer software used at the Facilities (subject to the terms of any applicable license agreement), to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer, the material components of which computer hardware, telecommunications and information technology systems and software are set forth on **Schedule 1.1(g)** (the "IT Systems");

(h)      Equipment Leases.  All right, title and interest of Sellers, if any, in and to all leases for any equipment, machinery, vehicles, furniture or other personal property located at, or used in connection with the operation and maintenance of the Acquired

2

Assets, together with all deposits made by Sellers thereunder, which leases shall be listed on **Schedule 1.1(h)** by August 29, 2014, prior to the Sale Hearing (the "Equipment Leases");

(i)     Licenses and Permits.  Subject to the provisions of section 365(c) of the Bankruptcy Code, all right, title and interest of Sellers in and to all licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any federal, state or local government or other political subdivision thereof, including, without limitation, any person or entity exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the person, entity exercising or property in question ("Governmental Authority") with respect to the Acquired Assets, including, without limitation, the construction, use or occupancy of the Facilities, together with any deposits made by Seller(s) thereunder, including those listed in **Schedule 1.1(i)**, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Licenses  and Permits");

(j)     Intellectual Property.  Subject to the provisions of section 365(c) of the Bankruptcy Code, all right, title and interest of Sellers, in and to all trademarks, trade names, service marks and other intellectual property rights, including the items set forth in **Schedule 1.1(j)**, and all goodwill associated therewith (the "Intellectual Property", and collectively with the FF&E, the Supplies, and the IT Systems, the "Personal Property");

(k)     Books and Records.  All right, title and interest of Sellers in and to all books and records in the Sellers' possession to the extent they relate to the Acquired Assets, including the operating books of the Facilities, but expressly excluding all documents and other materials which are legally privileged or constitute attorney work product (the "Books and Records");

(l)     Plans and Specifications.  All right, title and interest of Sellers in and to all plans and specifications, blue prints, architectural plans, engineering diagrams and similar items which relate to the Facilities (the "Plans and Specifications");

(m)     Warranties.  All right, title and interest of Sellers in and to all warranties and guaranties with respect to any Improvements or Personal Property (the "Warranties");

(n)     Assumed Contracts.  Within six (6) business days prior to the Auction by 5 p.m. on September 10, 2014, Purchaser shall identify the executory contracts and leases to be assumed and assigned to Purchaser including, but not limited to, the Equipment Leases, Operating Agreements, and any other executory contract, all of which shall be identified on **Schedule 1.1(n)** hereto (the "Assumed Contracts"). Sellers shall seek authority from the Bankruptcy Court to assume and assign the Assumed Contracts; Purchaser shall pay any required cure costs in full.

3

**Section 1.2  Excluded Assets**.  Notwithstanding anything to the contrary in Section 1.1, the property, assets, rights and interests set forth in this Section 1.2 (the "Excluded Assets") shall not be transferred, assigned or conveyed to Purchaser, and shall be excluded from the Acquired Assets:

(a)  Operating Accounts; Cash and Escrow Account.  (i) Any operating accounts; (ii) any cash of Sellers as of the Adjustment Time to the extent constituting Cash on Hand (which is addressed in Section 11.3(c)); and (iii) the escrow account Nos. ending in xx-xx4010.1 and xx-xx4010.2 at HSBC Bank (the "Escrow Account").

(b)  Third-Party Property.  Any personal property: (1) owned by any employee of Sellers which constitutes such employee's personal effects; (2) owned by the lessor under any Equipment Leases, (3) owned by the supplier, vendor, licensor or other party under all maintenance, repair, improvement, service and supply contracts.

(c)  Avoidance Actions.  Any and all avoidance actions or claims arising under sections 502(d), 510, 544, 547, 548, 550 or 553 of the Bankruptcy Code including without limitation the proceeds or property recovered thereof, and all commercial tort claims of the Sellers.

(d)  Accounts Receivable and Revenue.  All accounts receivable and revenue earned or accrued prior to the date of closing shall remain with the Seller.

(e)  TPI's Shares in CFC.  TPI is the sole shareholder of CFC.  CFC's shares shall remain with TPI.

**Section 1.3  Assumption of Liabilities.**  At the Closing, Purchaser shall assume, and thereafter pay, perform, and discharge, when due, all liabilities and obligations of Sellers with respect to Assumed Contracts first arising after the Closing, which liabilities and obligations are required to be paid by Purchaser in accordance with section 365(k) of the Bankruptcy Code (the "Assumed Liabilities").  Nothing herein shall preclude Purchaser from complying with its requirements under the FERC licenses for the Facilities following the Closing.

**Section 1.4  Retained Liabilities.**  Purchaser is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Sellers (all such liabilities are, collectively, the "Retained Liabilities").  For the avoidance of doubt, the Retained Liabilities include, without limitation, the following liabilities and obligations:

(a)  all liabilities and obligations of the Sellers of whatever nature whether presently in existence or hereafter arising, other than the Assumed Liabilities;

(b)  all liabilities and obligations of Sellers relating to the Excluded Property;

4

(c)     all liabilities and obligations relating to operation of the Facilities, which occurred or accrued prior to the Closing; and

(d)     all of Sellers' accounts payable.

# ARTICLE II

## CONSIDERATION

**Section 2.1  Purchase Price**.  The cash purchase price for the Acquired Assets shall be _____ and 00/100 Dollars ($____,000.00) (the "Purchase Price") subject to the adjustments provided under Article XII of this Agreement. Any sums due from Purchaser or Sellers at Closing shall be paid by wire transfer of immediately available funds on the Closing Date for disbursement to the applicable party entitled to payment at Closing upon the terms and conditions herein set forth.

**Section 2.2  Deposit**.  Purchaser has deposited in escrow with [Sellers'] counsel (the "Escrow Account") the sum of ____ Dollars ($___) as a ten percent (10%) deposit (such amount, together with all interest thereon being referred to as the "Deposit"). Sellers' attorneys shall hold the Deposit in escrow and distribute it in accordance with the terms of this Agreement.

**Section 2.3  Allocation of Purchase Price**.   Purchaser shall allocate the Purchase Price between the acquired assets the schedule of allocation attached hereto as **Schedule 2.3.** Following the Closing, each party agrees to file federal, state and local tax returns consistent with such allocations agreed upon between the Parties.

# ARTICLE III

## CONTINGENCIES

**Section 3.1  Due Diligence Inspections**.

(a)     Purchaser acknowledges that it has already performed such examinations, tests, investigations and studies of the Acquired Assets (the "Inspections") as Purchaser deems advisable, in accordance with this Section 3.1 and expressly waives any further Inspections and due diligence.  Purchaser has conducted the Inspections with its officers, employees, contractors, consultants, agents or representatives ("Purchaser's Inspectors") and has caused the Purchaser's Inspectors to comply with the provisions regarding Confidential Information set forth in Section 3.4. and the Access Agreement. Purchaser confirms that it has appropriate insurance coverage in place with respect to the Inspections and agrees to indemnify and hold Sellers harmless from any and all claims and demands which may be made by reason of Purchaser or its designees entering onto the Real Property for the above purposes, excepting any damages related to required disclosures to any governmental authority; provided, however, that Purchasers and its designees agree to use diligent efforts to first notify Sellers or its counsel before making disclosure to any governmental authority.

5

(b)    Sellers acknowledge and agree that Purchaser may contact counterparties of any and all Equipment Leases, Licenses and Permits, and all other contractual arrangements to be assigned to or assumed by Purchaser pursuant to the terms of this Agreement in order to obtain estoppel certificates and other information related to the performance of the parties under and status of such Equipment Leases, Licenses and Permits, or all other contractual arrangements and shall provide Sellers with copies of same.

Section 3.2  **Sellers' Due Diligence Materials**.

(a)    **PURCHASER HAS BEEN INFORMED AND ACKNOWLEDGES THAT THE SELLERS HAVE NOT BEEN INVOLVED IN THE OPERATIONS OR FINANCIAL MANAGEMENT OF THE ACQUIRED ASSETS.**  Purchaser acknowledges its receipt of the due diligence materials contained on the secure web site established by Sellers' representative and accessible by means of the Internet link thereto previously provided by Sellers (or their representatives) to Purchaser (the "Data Room Web Site") as well as materials requested by Purchaser which Sellers have caused to be delivered to Purchaser.  All documents and materials provided by Seller to Purchaser pursuant to this Agreement, together with any copies or reproductions of such documents or materials, or any summaries, abstracts or compilations based on the information in such documents or materials provided by Sellers, are referred to collectively herein as the "Seller Due Diligence Materials". For the avoidance of doubt, Seller Due Diligence Materials shall exclude any summaries, abstracts, compilations and any other analysis made by or for Purchaser and any reports, writings or correspondence between Purchaser and third parties with whom Purchaser may contract with for goods or services related to the Acquired Assets, whether or not any such item is based on the information contained in any Seller Due Diligence Materials.

(b)    If this Agreement is terminated, Purchaser promptly shall (a) return or destroy all original Seller Due Diligence Materials provided to Purchaser, and destroy all other Seller Due Diligence Materials, and (b) use commercially reasonable efforts to cause all Persons to whom Purchaser has provided any Seller Due Diligence Materials to return or destroy any original Seller Due Diligence Materials to Purchaser, and destroy all other Seller Due Diligence Materials.

Section 3.3  **Purchaser's Due Diligence Reports**.  Upon termination of this Agreement, Purchaser shall provide a copy to Sellers of all studies, reports and assessments prepared by any Person for or on behalf of Purchaser (other than any internal studies, reports and assessments prepared by any of Purchaser's employees, attorneys or accountants) in connection with the Inspections (the "Purchaser Due Diligence Reports").

Section 3.4  **Confidentiality**.

(a)    Disclosure of Confidential Information.  Sellers and Purchaser shall keep confidential and not make any public announcement or disclose to any person any

6

terms of this Agreement (as opposed to the existence of this Agreement) or any information disclosed by the Inspections or in the Seller Due Diligence Materials, the Purchaser Due Diligence Reports or any other documents, materials, data or other information with respect to the Acquired Assets or the Facilities which, in each of the foregoing cases, is not generally known to the public (the "Confidential Information"). Notwithstanding the foregoing, Sellers and Purchaser shall be permitted to disclose any Confidential Information (i) to the extent required under applicable law, (ii) if either Party receives an opinion of counsel that it is legally obligated to release the Confidential Information (in which event, such Party may do so after notice to and in consultation with the other Party), (iii) in order to take legal action to enforce this Agreement, or (iv) to the Court, Sellers' professionals, Algonquin's professionals', and the United States Trustee's Office the extent necessary to obtain the Bidding Procedures Order, conduct the Auction, and obtain the Sale Order (as defined below). Notwithstanding anything to the contrary in this Agreement, Purchaser and its agents and contractors may disclose any Confidential Information which the Purchaser and/or its agents and contractors have a legal obligation to disclose to any governmental or regulatory agency. The obligation to maintain the Confidential Information shall survive the termination of this Agreement.

(b)      Communication with Governmental Authorities.  Purchaser or Purchaser's Inspectors may communicate with any appropriate Governmental Authority regarding zoning, entitlements, licenses and land use approvals and/or agreements with respect to the Facilities. Purchaser or its agents or contractors may also communicate with any appropriate Governmental Authority regarding Licenses and Permits and their transfer, code enforcement claims, claims or threats of eminent domain.

(c)      Communication.  Sellers shall use commercially reasonable efforts to allow Purchaser or Purchaser's Inspectors to communicate regarding the Facilities with the Debtors' representative, Mercer Construction Company, and Algonquin, as operator of the Facilities, provided that Purchaser gives Sellers reasonable prior written notice of.

**Section 3.5  Conduct of Business**.  Purchaser acknowledges that Sellers will rely exclusively on Algonquin to continue the operation of their business pursuant to the terms of the Management Agreement between the parties during the period from the Effective Date to the Closing Date (except as otherwise expressly provided by the terms of this Agreement or order of the Bankruptcy Court entered on or prior to the Effective Date in the Bankruptcy Proceedings).  While it is the intent that Algonquin shall carry on the Sellers' businesses with respect to the Acquired Assets in the ordinary course, Seller makes no warranties or representations regarding same. Sellers agree that Sellers shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld or delayed, enter into any new Leases or modify any existing Leases, except to extend any existing real property leases.

# ARTICLE IV

## TITLE TO THE ACQUIRED ASSETS

**Section 4.1   <u>Insurable Title / Title Commitment</u>.**

(a)      Sellers shall provide Purchaser with all title reports, abstracts of title, and surveys relating to the Real Property in its possession.  Sellers and their counsel shall obtain a commitment (the "<u>Title Commitment</u>") for an ALTA owner's title insurance policy (the "<u>Title Insurance Policy</u>") on all of the Real Property from a reputable title insurance company selected by Sellers and licensed in the State of New York (the "<u>Title Company</u>") and Purchaser shall pay the premiums for the Title Insurance.   The Purchaser agrees to accept insurable title and the Title Insurance Policy issued by the Title Company using Sellers' counsel as authorized signatory subject to the matters set forth in Section 4.1(b) below (the "Permitted Exceptions").  Sellers shall provide surveys in their possession, (if any), but shall not be required to update said surveys or otherwise be responsible for the cost of producing same.  Purchaser agrees to accept said Title Insurance Policy subject to any state of facts a survey would show ("Survey Exceptions").

(b)      The Real Property and Facilities are being sold, and Purchaser agrees to purchase the Real Property and Facilities, subject to the following Permitted Exceptions: (i) zoning regulations and ordinances, building codes, environmental protection laws, regulations and ordinances and other applicable local, state, county or federal legal and governmental requirements; (ii) the printed conditions and stipulations contained in the standard title insurance policy of the Title Company, unless Purchaser obtains, at its sole cost, expense and risk, endorsements to the title policy which exclude any such standard printed exceptions; (iii) any leases and the rights of tenants thereunder; (iv) the lien of any assessments and water and sewer charges which are payable or may be payable in annual installments, apportioned as provided for in this Agreement; (v) the lien of current real estate taxes, water and sewer charges or taxes, not yet due and payable; (vi) any state of facts disclosed by a survey of the Real Property; (vii) any utility company rights, and easements for electricity, water, steam, gas, telephone or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Real Property; (viii) any agreements, covenants, restrictions, reservations, or easements of record; (ix) any lien, encumbrance or other title exception over which the Title Company is willing to insure (without additional cost to Purchaser) or which will be extinguished upon transfer of title to the Real Property; (x) financing statements, chattel mortgages and liens on personalty filed more than five (5) years prior to the Closing Date and not renewed or continued, or filed against property no longer located on the Real Property; (xi) the exceptions to title accepted or deemed accepted by Purchaser pursuant to Section 4.2(b) and (c) below; (xii) all matters, whether or not of record, that arise out of the actions of the Purchaser or the Purchaser's representatives acting on the Purchaser's behalf; and (xiii) those matters set forth on **<u>Schedule 4.1(b)</u>**.

8

**Section 4.2  <u>Title and Survey Review</u>.**

(a)  <u>Title and Survey Review</u>. Within seven (7) business days after the receipt of the Title Commitment, the Title Documents, and any existing surveys of all of the Real Property, Purchaser shall notify Sellers in writing of any objections to the exceptions appearing in the Title Commitment  (collectively "<u>Objections to Title</u>").  The Objections to Title shall set forth in detail the nature of the Purchaser's objections to title (provided that such notice shall not set forth as objections Permitted Exceptions).

(b)  Within ten (10) business days following Purchaser's notice of the Objections to Title, Sellers shall notify Purchaser: (i) that it will, prior to the Closing Date, eliminate the exceptions to which Purchaser has objected; or (ii) that it declines to eliminate specified exceptions to which Purchaser has objected. If Sellers fail to respond within such ten (10) business day period, it shall be deemed to have declined to eliminate all exceptions to which Purchaser has objected. If Sellers elect by written notice to Purchaser, or if Sellers are deemed to have elected not to take such actions as may be required by the Title Company to remove all exceptions to title to which Purchaser has objected, Purchaser may accept title to the Real Property subject to such objections or, within three (3) business days following receipt of such notice or following the date of such deemed election, give written notice to Sellers (the "<u>Termination Notice</u>") terminating this Agreement solely with respect to the portion of the Real Property or Facilities subject to the uncured exception(s) to title; **it being expressly understood and agreed to between the Sellers and Purchaser that this Agreement shall continue in full force and effect with respect to the remaining Real Property and Facilities.**  In the event Purchaser terminates this Agreement with respect to a portion of the Real Property, the Purchaser shall receive a reduction in the Purchase Price in the amount allocated to such Real Property as set forth in **<u>Schedule 4.2(b)</u>**.

(c)  If Purchaser fails to give either notice of the Title Objections or the Termination Notice within the respective time periods specified herein, Purchaser shall be deemed to have accepted title to all matters or conditions hereinbefore referenced and to have waived any and all objections to the same or to any other matters or conditions of title whereupon any and all exceptions and matters set forth therein and/or such other matters or conditions of title shall be deemed to constitute, in addition to other matters herein set forth in this Agreement, Permitted Exceptions.  Any condition of title that is not expressly objected to in the Title Notice shall be deemed to have been accepted by Purchaser. If Sellers agree to take the actions necessary to eliminate any exceptions to which Purchaser has objected, then such exceptions shall not be Permitted Exceptions and Sellers shall cause such exceptions to be removed prior to or at Closing.

(d)  <u>Extension of Closing Date</u>. The parties acknowledge that time is of the essence in closing this transaction.  Notwithstanding anything to the contrary contained in this Agreement, the Closing Date may be adjourned as necessary to permit Purchaser and Sellers to deliver the notices described in subsection (a) and (b) above in the timeframes provided in subsection (a) and (b) above but in no event shall be later

213834 2295450v11

than December 23, 2014 without the written consent of the Sellers; and in no event shall be no later than December 31, 2014.

Section 4.3 **Conveyance of the Real Property.** At Closing, Sellers shall convey to Purchaser insurable title to the Real Property subject to the Permitted Exceptions by bargain and sale deed (the "Deed") .

Section 4.4 **Conveyance of Personal Property.** Sellers shall convey to Purchaser the Personal Property, by a bill of sale. Any sales tax shall be paid by Purchaser.

## ARTICLE V

## BANKRUPTCY ACTIONS

Section 5.1 **Bankruptcy Court Approval/Bid Protections.** This Agreement is subject to the entry by the Bankruptcy Court of (i) an order as to which no stay pending appeal has been issued substantially in the form of **Exhibit B** (the "Sale Procedures Order"); and (ii) an order of the Bankruptcy Court approving the sale to Purchaser pursuant to the terms of this Agreement as to which no stay pending appeal has been issued in form and substance acceptable to Sellers and Purchaser (the "Sale Order") to be entered by the Bankruptcy Court following the sale hearing (the "Sale Hearing"). The Sale Order shall, among other matters:

(i)      approve the sale of the Acquired Assets on the terms set forth herein;

(ii)      find that, as of the Closing, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to Purchaser and shall vest Purchaser with title to the Acquired Assets free and clear of all mortgages, liens, judgments, claims of every nature (including successor liability claims), objections to purchase, security interests, and other encumbrances subject only to the Permitted Exceptions;

(iii)      find that the consideration provided by Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets;

(iv)      find that, as of the Closing, all Assumed Contracts to be assumed by Sellers and assigned to Purchaser pursuant to this Agreement will have been duly assigned to Purchaser in accordance with Section 365 of the Bankruptcy Code;

(v)      find that Purchaser is a good faith purchaser of the Acquired Assets pursuant to Section 363(m) of the Bankruptcy Code;

(vi)      order that the Assumed Contracts assumed by Sellers and assigned to Purchaser pursuant to this Agreement will be transferred to, and remain in

10

full force and effect for the benefit of Purchaser, notwithstanding any provision in any such Acquired Contract that prohibits, restricts, or limits in any way such assignment or transfer and the proposed cure amounts are approved;

(vii)    approve any other agreement to the extent provided by this Agreement;

(viii)    find that the Sellers gave due and proper notice of the sale of the Acquired Assets to each party entitled thereto;

(ix)    find that Purchaser has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the Assumed Contracts;

(x)    authorize Purchaser to pay any costs to cure defaults under the Assumed Contracts;

(xi)    order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.

Section 5.2  **Highest and Best Offer.**  Sellers represent that the Sellers have taken aggressive steps to market the Acquired Assets, including its hiring of Clearbid Capital, LLC, to market the Acquired Assets.   If a qualified bidder submits a higher or better offer as defined in the Sale Procedures Order, an auction will take place at a time and place set by the Bankruptcy Court.  Sellers reserve the right to modify  the terms, conditions and procedures at the Auction in accordance with the Sale Procedures and Sale Procedures Order.

Section 5.3  **Termination by Purchaser.**  Purchaser may terminate this Agreement: (i) if the Sale Order is not entered on or prior to September 30, 2014; (ii) if the Sellers choose a bidder other than Purchaser as the Successful Bidder (as defined in the Bidding Procedures Order) and the Purchaser is not designated as the Back-Up Bidder (as defined in the Bidding Procedures Order); or (iii) if Sellers choose a bidder other than Purchaser as the Successful Bidder and Purchaser is designated as the Back-Up Bidder pursuant to the Bidding Procedures Order, on the date on which the sale to the Successful Bidder closes. In the event of a termination of this Agreement pursuant to this Section 5.3, (x) the Deposit shall be immediately paid to Purchaser. After such termination, neither Party shall have any further rights or obligations pursuant to this Agreement, other than as set forth herein with respect to rights or obligations that survive termination, provided that no such termination shall impair Purchaser's right to exercise its rights and remedies under Section 9.1 hereof in the event of a Sellers' default, if applicable.

11

**Section 5.4   <u>Termination by Sellers</u>**.

(a)     Except to the extent otherwise expressly provided in this Agreement, Purchaser acknowledges and agree that Sellers shall have the right to terminate this Agreement and/or the sales process described in Section 5.2 from and after the entry of the Sale Procedures Order. If Sellers do terminate the sale process, Purchaser shall be entitled to receive the Deposit.

(b)     In the event another qualified bidder is selected as the Successful Bidder to purchase the Acquired Assets pursuant to a sale transaction pursuant to the procedures set forth in Section 5.2 and Sellers consummate a Sale Transaction to such new purchaser, then this Agreement shall terminate (to the extent this Agreement has not already been terminated by Purchaser pursuant to Section 5.3) and (1) Sellers' attorneys shall immediately refund the Deposit to Purchaser, and (2) if Purchaser was designated as a Stalking Horse Bidder, Sellers shall pay from the sale proceeds on the Closing Date an amount in cash equal to the Break-up Fee.

**Section 5.5  <u>Survival</u>.** Sellers' obligation to pay to Purchaser the Break-up Fee out of the sale proceeds in accordance with the terms of this Agreement shall survive any termination of this Agreement, to the extent applicable, but is only payable in the event Purchaser was designated by the Debtors as a Stalking Horse Bidder.

## ARTICLE VI

## CLOSING

**Section 6.1  <u>Closing</u>.** Closing of the transactions contemplated by this Agreement ("<u>Closing</u>") shall be held at the offices of the Seller's attorneys.  If all conditions precedent set forth in this Agreement are fully satisfied (except for those conditions for the benefit of either Purchaser or Sellers, if any, that are waived or deemed waived), Purchaser and Sellers shall consummate the purchase and sale contemplated hereby and make full settlement hereunder pursuant to the terms hereof within 5 business days of the date on which all conditions precedent have been satisfied, but in any event not later than December 31, 2014, time being of the essence subject only to adjournments set forth in Section 4.2(b) of this Agreement (the "<u>Closing Date</u>").

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

**Section 7.1  <u>Sellers' Representations and Warranties</u>.** Each Seller warrants to Purchaser that, as of the Effective Date:

213834 2295450v11

(a) <u>Organization</u>.   TPI is a corporation formed under the laws of the State of Delaware.  CFC is a corporation formed under the laws of the State of New York.

(b) <u>Power</u>. Each Seller has all requisite corporate power to enter into this Agreement and to carry out its obligations hereunder.

(c) <u>Due Authorization</u>. Subject to the entry of the Bidding Procedures Order and the Sale Order, the execution and delivery of this Agreement and the performance by each Seller of its obligations hereunder, have been duly authorized by all necessary action of each Seller and no other proceedings on the part of the Sellers are necessary to authorize such execution, delivery and performance.

(d) <u>Execution</u>. This Agreement has been duly executed by each Seller and, subject to the entry of the Bidding Procedures Order and the Sale Order, constitutes its valid and binding obligation, enforceable against each Seller in accordance with the terms herein and therein.

(e) <u>Litigation</u>.   Sellers are currently contesting an involuntary surrender of its FERC license for the Herkimer Facility (the "Herkimer License Surrender Proceeding").

(f) <u>Due Diligence Response</u>. **PURCHASER HAS BEEN INFORMED AND ACKNOWLEDGES THAT THE SELLERS HAVE NOT BEEN INVOLVED IN THE OPERATIONS OR FINANCIAL MANAGEMENT OF THE ACQUIRED ASSETS.** After reasonable search and inquiry, the information Sellers have provided in response to due diligence requests by Purchaser is all of the material information in Sellers' possession responsive to such requests.  The Acquired Assets are being conveyed on an "As Is/Where Is" basis, and the Seller represents that financial information provided in response to due diligence requests by the Purchaser was provided to Sellers by its operator and manager, Algonquin.

**Section 7.2 <u>Purchaser's Representations and Warranties</u>.** Purchaser represents and warrants to Sellers that, as of the Effective Date, (i) Purchaser is a [legal form] existing under the laws of the State of [tbd], (ii) Purchaser has all requisite corporate power to enter into this Agreement and to carry out its obligations hereunder, (iii) the execution and delivery of this Agreement and the performance by Purchaser of its obligations hereunder have been duly authorized by all necessary action of Purchaser, and no other proceedings on the part of Purchaser are necessary to authorize such execution, delivery and performance, (iv) this Agreement has been duly executed by Purchaser, and subject to the entry of the Bidding Procedures Order and the Sale Order constitutes its valid and binding obligation, enforceable against it in accordance with the terms herein and therein.

**Section 7.4 <u>As-Is.</u>**

(a)     Except as otherwise provided herein, Purchaser expressly acknowledges and agrees to accept the Acquired Assets and title thereto on an "***as-is-where-is and***

13

***with all faults***" basis.    **WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THERE IS NO WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A SPECIFIC PURPOSE OR AS TO THE CONDITION OF THE REAL PROPERTY OR PERSONAL PROPERTY, IF ANY.**

(b)    This Agreement, as written, contains all the terms of the agreement entered into between the parties as of the date hereof, and Purchaser acknowledges that, except as otherwise provided herein, neither Sellers nor any of Sellers' affiliates, nor any of its agents or representatives, has made any representations or held out any inducements to Purchaser, and Sellers hereby specifically disclaim any representation, oral or written, past, present or future, express or implied, other than those specifically set forth herein.  Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and neither Sellers nor any of Sellers' affiliates, nor any of its agents or representatives has or is willing to make any representations or warranties, express or implied, other than as may be expressly set forth herein, as to (i) the status of title to the Acquired Assets; (ii) the current or future real estate tax liability, assessment or valuation of the Acquired Assets; (iii) the potential qualification of the Acquired Assets for any and all benefits conferred by any laws whether for subsidies, special real estate tax treatment, insurance, mortgages or any other benefits, whether similar or dissimilar to those enumerated, (iv) the compliance of the Acquired Assets in its current or any future state, or its prior, current or future use, with applicable laws or any violations thereof, including, without limitation, those relating to access or zoning matters and any applicable "Environmental Laws" (as hereafter defined), and the ability to obtain a change in the zoning or a variance in respect to the Acquired Assets' non-compliance, if any, with zoning laws; (v) the nature and extent of any right-of-way, lease, possession, lien, encumbrance, license, reservation, condition or otherwise; (vi) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Acquired Assets from any source, including, without limitation, any government authority or any lender; (vii) the current or future use of the Acquired Assets; (viii) the present and future condition and operating state of the Acquired Assets, and the present or future structural and physical condition of the Acquired Assets, their suitability for rehabilitation or renovation, or the need for expenditures for capital improvements, repairs or replacements thereto, (ix) the status of the sale and/or leasing market in which the Acquired Assets are located, (x) the actual or projected income or operating expenses of the Acquired Assets, (xi) the number of acres or configuration of the Acquired Assets, (xii) the square footage of any buildings or other structures on the Acquired Assets, (xiii) the street addresses of the Acquired Assets; (xiv) the location, availability or suitability of any utility services and/or facilities; or (xv) the accessibility of the Acquired Assets to any publicly-dedicated roads or highways.  As used herein, "Environmental Laws" shall mean all federal, state and local environmental, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of any "Hazardous Substance" (as hereinafter defined) and the rules, regulations, and orders with respect thereto.  "Hazardous Substance" means, without

14

limitation, any flammable, explosive or radioactive material, polychlorinated biphenyl, petroleum or petroleum product, methane, hazardous materials, hazardous wastes, hazardous or toxic substances or related materials, as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Appendix Sections 1801, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901, et seq.), the Toxic Substances Control Act, as amended (15 U.S.C. Sections 2601, et seq.), Articles 15 and 27 of the New York State Environmental Conservation Law or any other Environmental Law and the regulations promulgated thereunder applicable on the Effective Date.

(c)      Purchaser acknowledges and agrees that (a) the Seller Due Diligence Materials delivered or made available to Purchaser and Purchaser's representatives by Sellers or Sellers' affiliates, or any of their agents or representatives, including those due diligence materials contained on the Data Room Web Site, may have been prepared by third parties and may not be the work product of Seller and/or any of Seller's affiliates; (b) neither Sellers nor any of Sellers' affiliates has made any independent investigation or verification of, or has any knowledge of, the accuracy or completeness of, the Seller Due Diligence Materials; (c) the Seller Due Diligence Materials delivered or made available to Purchaser and Purchaser's representatives is furnished to each of them at the request, and for the convenience of, Purchaser; (d) Purchaser is relying solely on its own investigations, examinations and inspections of the Acquired Assets and those of Purchaser's representatives and is not relying in any way on the Seller Due Diligence Materials furnished by Sellers or any of Sellers' affiliates, or any of their agents or representatives, or to the extent that Purchaser does so rely on such Seller Due Diligence Materials, it does so at its sole option and risk and without representation or warranty from, or inducement to do so by, Seller; and (e) Sellers expressly disclaim any representations or warranties with respect to the accuracy or completeness of the Seller Due Diligence Materials and Purchaser releases Sellers, Algonquin and their affiliates, agents and representatives, from any and all liability with respect thereto.

(d)      Purchaser or anyone claiming by, through or under Purchaser, hereby fully and irrevocably releases Sellers, Algonquin, and their affiliates, agents and representatives, from any and all claims that it may now have or hereafter acquire against Sellers, Algonquin and their affiliates, agents or representatives for any cost, loss, liability, damage, expense, action or cause of action, whether foreseen or unforeseen, arising from or related to any construction design or defects, errors or omissions on or in the Acquired Assets, the presence of environmentally hazardous, toxic or dangerous substances, or any other conditions (whether patent, latent or otherwise) affecting the Acquired Assets.

**Section 7.3  Survival   of   Representations   and   Warranties.**    The representations and warranties of Sellers set forth in Section 7.1 shall not survive Closing in the bankruptcy case; provided, however, that the provisions of Section 7.2

15

shall survive the expiration or termination of this Agreement and the Closing in the bankruptcy case.

# ARTICLE VIII

# CLOSING DELIVERABLES

**Section 8.1  Seller's Closing Deliverables.** At Closing, Sellers shall execute and/or deliver to Purchaser the following (collectively, the "Seller Deliveries"):

(a)     the Bargain and Sale Deed;

(b)     a Bill of Sale substantially in the form of **Exhibit 8.1(b)**;

(c)     an Assignment and Assumption of the Assumed Contracts;

(d)     an Assignment to Purchaser of Warranties, Licenses and Permits substantially in the form of **Exhibit 8.1(d)**;

(e)     for each corporate Seller, a secretary's certificate certifying Seller's certificate of incorporation, bylaws, copies of resolutions duly adopted by the board of directors of Seller approving the execution and delivery of this Agreement and the closing of the transactions contemplated hereunder and the incumbency of the officers of Seller executing any document to be delivered by this Agreement;

(f)     a certified copy of the Bidding Procedures Order;

(g)     a certified copy of the Sale Order;

(h)     the Settlement Statement (as defined in Section 12.1, below);

(i)     notices in the form attached hereto as **Exhibit 8.1(i)** (the "Vendor Notice Letters") signed by the Seller lessee or Algonquin advising the lessor under each of the Leases being assumed by Purchaser at Closing, of the address for notices to and other communications with Purchaser;

(j)     delivery of possession of the Acquired Assets to Purchaser, together with the keys for all security systems, rooms and offices, and all Books and Records relating to the Acquired Assets in the possession of Sellers, including all maintenance records;

(k)     such other documents as may be reasonably required by the Title Company to issue the Title Policy, including, without limitation, any state, county and municipal transfer tax declarations and other documents required with respect to the transfer of the Acquired Assets;

16

213834 2295450v11

(l)    such other documents as may be reasonably required by the Purchaser in order to consummate the transactions described in this Agreement.

**Section 8.2 Purchaser's Closing Deliverables.** At Closing Purchaser shall execute and/or deliver to Sellers the following (collectively, the "Purchaser Deliveries"):

(a)    the payments contemplated by Section 2.1 of this Agreement;

(b)    a counterpart of each of the documents and instruments to be delivered by Sellers under Section 8.1 which require execution by Purchaser;

(c)    such other documents as may be reasonably required by the Title Company to issue the Title Policy, including, without limitation, any state, county and municipal transfer tax declarations and other documents required with respect to the transfer of the Acquired Assets; and

(d)    such other documents and instruments as may be reasonably requested by Sellers in order to consummate the transactions described in this Agreement.

## ARTICLE IX

## CONDITIONS TO CLOSING

**Section 9.1    Conditions to Purchaser's Obligation to Close.** The obligation of Purchaser to consummate the transaction contemplated herein shall be conditioned upon the fulfillment of the following conditions as of the Closing:

(a) The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and no order staying, reversing, modifying or amending the Bidding Procedures Order or Sale Order shall be in effect on the Closing Date;

(b) No preliminary or permanent injunction or other order that declares this Agreement invalid or unenforceable in any respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect;

(c) FERC has approved the transfers of the licenses for the Facilities to the Purchaser;

(d) The Title Company shall be irrevocably committed to issue an ALTA owner's title policy insuring Purchaser's ownership of the Real Property, showing title to the Real Property vested in Purchaser, in the manner described in Article IV of this Agreement (the "Title Policy"), subject to payment of the applicable policy premium by the Purchaser.

(e) Sellers shall have delivered to Purchaser the Seller Deliveries;

17

(f)  Sellers shall have performed all agreements, undertakings and obligations in all material respects and complied in all material respects with all conditions required by this Agreement to be performed and/or complied with by Sellers prior to the Closing;

(g) This Agreement shall not have been terminated by Purchaser in accordance with the terms of this Agreement.

**Section 9.2  Failure of Conditions to Purchaser's Obligation to Close.**  In the event that any of the conditions set forth in Section 9.1 have not been fulfilled on the Closing Date, Purchaser shall have the right, in addition to its rights and remedies under Section 10.1 (in the event of Sellers' default, if applicable), to: (i) waive such condition in writing and proceed to Closing, or (ii) extend the Closing Date for such additional period of time, not to exceed thirty (30) days, as may be reasonably required to allow such failure to be remedied. In the event Purchaser elects option (ii) and the failed condition has not been satisfied after such thirty (30) day period, Purchaser may then elect either option (i) or (ii). Notwithstanding the foregoing, in the event of a failure of any of the conditions set forth in Sections 9.1(d) or (e) on the Closing Date, Purchaser shall give Sellers notice thereof and the Closing Date shall be delayed pursuant to Section 10.1 hereof, if necessary, until the end of the notice and cure period set forth in Section 10.1, and if such applicable condition(s) are not fulfilled on the Closing Date as so delayed, then Purchaser may pursue all of its right and remedies under Section 10.1 with respect to such failure of condition(s).

**Section  9.3 Conditions to Sellers' Obligation to Close.** The obligation of Sellers to consummate the transaction contemplated herein shall be conditioned upon the fulfillment of the following conditions as of the Closing:

(a) The Bankruptcy Court shall have entered the Sale Order, and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(b) No preliminary or permanent injunction or other order that declares this Agreement invalid or unenforceable in any respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect;

(c) Purchaser shall have delivered the Purchaser Deliveries to the Title Company;

(d) Purchaser shall have performed all agreements, undertakings and obligations in all material respects and complied in all material respects with all conditions required by this Agreement to be performed and/or complied with by Purchaser prior to the Closing;

(e) All representations and warranties made by Purchaser set forth in Section 7.2 shall be true and correct on the Closing Date, in all material respects, as if made on and as of the Closing Date; and

18

(f)  This Agreement shall not have been terminated by Purchaser pursuant to the terms of this Agreement.

**Section 9.4   <u>Failure of Conditions to Sellers' Obligation to Close</u>.** In the event that any of the conditions set forth in Section 9.3 have not been fulfilled on the Closing Date, Sellers shall have the right, in addition to its rights and remedies under Section 10.2 (in the event of Purchaser's default, if applicable), at its option, to (i) terminate this Agreement by giving written notice to Purchaser, whereupon (x) the Deposit shall be returned to Purchaser, (y) Purchaser and Sellers shall thereafter be relieved of further liability hereunder, except to the extent survival is expressly provided herein, (ii) waive such condition in writing and proceed to Closing, or (iii) extend the Closing Date for such additional period of time, not to exceed thirty (30) days, as may be reasonably required to allow such failure to be remedied. In the event Sellers elects option (iii) and the failed condition has not been satisfied after such thirty (30) day period, Sellers may then elect either option (i) or (ii). Notwithstanding the foregoing, in the event of a failure of any of the conditions set forth in Sections 9.3(c) or (d) on the Closing Date, Sellers shall give Purchaser notice thereof and the Closing Date shall be delayed pursuant to Section 9.2, if necessary, until the end of the notice and cure period set forth in Section 9.2, and if such applicable condition(s) are not fulfilled on the Closing Date as so delayed, then Sellers may pursue all of their rights and remedies under Section 9.2 with respect to such failure of condition(s).

**Section 9.5   <u>Waiver of Conditions to Close</u>.** Either party shall have the right at its option to waive in writing any conditions of this Agreement that are included for its benefit, and to proceed hereunder without regard to any non-performance or non-satisfaction thereof; provided, however, with respect to any provision of this Agreement pursuant to which a party's inaction or failure to act is deemed a waiver of such provision, such party's inaction or failure to act shall be a waiver of such provision without the delivery of written notice of such waiver.

## ARTICLE X

## DEFAULT AND REMEDIES

**Section 10.1 <u>Seller Default</u>.** If Sellers shall fail to consummate the transaction contemplated herein or otherwise default in any material respect under this Agreement, and such failure or default continues for a period of thirty (30) days after Sellers' receipt of written notice thereof from Purchaser (and in each case, the Closing Date shall be delayed, if necessary, until the end of such period), then Purchaser's remedy shall be to either (a) terminate this Agreement by giving written notice to Sellers, whereupon the Deposit shall be returned to Purchaser and Sellers and Purchaser shall thereafter be relieved of further liability hereunder, except to the extent survival of such liability is expressly provided herein.

**Section 10.2 <u>Purchaser Default</u>.** If Purchaser shall fail to consummate the transaction contemplated herein, including, without limitation, delivering of all the items

19

set forth in Section 8.2 hereof as and when required by this Agreement, and such failure continues for a period of ten (10) business days after Purchaser's receipt of written notice thereof from Sellers (and the Closing Date shall be delayed, if necessary, until the end of such period), then Sellers' can terminate this Agreement by giving written notice to Purchaser, whereupon the Deposit shall be delivered to Sellers as liquidated damages and not as a penalty (it being acknowledged by the parties that actual damages are incapable of being ascertained), and Purchaser and Sellers shall thereafter be relieved of further liability hereunder, except to the extent survival is expressly provided herein.

## ARTICLE XI

## CLOSING COSTS AND PRORATIONS

### Section 11.1  Closing Costs.

(a) Purchaser shall be responsible for (i) the cost of recording of the Deed and any other instruments received by Purchaser, (ii) the premium, fees and expenses for the Title Commitment, the Pro Forma and the Title Policy, including any endorsements thereto (other than incremental costs related to the removal of any New Title Exceptions); (iii) any sales or similar tax payable in connection with the conveyance of the Personal Property, (iv) any updated or new surveys; and (v) any fees or expenses payable for the assignment, transfer or conveyance of any Licenses and Permits.

(b) Sellers shall be responsible for (i) any transfer, documentary stamps, surtax, intangibles or other similar taxes payable in connection with the conveyance of the Real Property, and (ii) the incremental costs related to the removal of any Title Exceptions.

(c) Sellers and Purchaser shall each pay, respectively (i) the fees and expenses of their own attorneys in connection with negotiation and settlement of this Agreement, and (ii) one-half (1/2) of any escrow fees of the Title Company. All other closing costs shall be apportioned according to the local custom of the jurisdiction in which the assets are located.

(d) All other closing costs (including real estate taxes) shall be apportioned according to the local custom or the jurisdiction in which the Acquired Assets are located.

### Section 11.2  Apportionments Generally.  For purposes hereof, the term "Adjustment Time" means 11:59 p.m. Eastern Time on the day prior to a Closing. Except as otherwise expressly provided herein, all income and expenses of the Acquired Assets with respect to the period prior to the applicable Adjustment Time shall be for the account of Sellers, and all income and expenses of the Acquired Assets with respect to the period from and after the applicable Adjustment Time shall be for the

20

account of Purchaser. Net credits in favor of Purchaser and net credits in favor of Sellers shall be shown on the Closing Statement with such supporting documentation, prepared by Sellers and approved by the Purchaser, as the parties hereto may reasonably require being attached as exhibits to the Closing Statement and shall increase or decrease (as the case may be) the cash amount payable by the Purchaser. All prorations shall be made on the basis of the actual number of days in the year and month in which the Closing occurs or in the period of computation. Unless otherwise indicated in Sections 11.2 through 11.7, Purchaser shall receive a credit for any of the following items in this ARTICLE XI to the extent the same are accrued but unpaid as of the Adjustment Time and Sellers shall receive a credit to the extent any of the following items have been paid prior to the Closing Date to the extent the payment thereof relates to any period of time after the Adjustment Time.

**Section 11.3 <u>Revenue</u>.** Other than Excluded Assets, all revenue, sales and income of any kind resulting from the ownership or operation of the Facilities, including, but not limited to, revenue, shall be apportioned as of the applicable Adjustment Time, subject to the following provisions of this Section 11.3.

(a) <u>Accounts Receivable</u>. Sellers shall retain all accounts receivable generated prior to the Adjustment Time. For the avoidance of doubt, accounts receivable include, but are not limited to, income from Power Purchase Agreements, insurance claims, chattel paper, notes, instruments and all other rights to receive payment from or to offset against obligations to third parties.

(b) <u>Cash on Hand</u>. All cash on hand ("<u>Cash on Hand</u>") at the Facilities, including any cash on deposit in the Sellers' DIP or other operating accounts shall be counted by Sellers and Purchaser as of the applicable Adjustment Time, and shall be retained by Sellers.

**Section 11.4 <u>Licenses and Permits</u>. Purchaser shall be responsible for submitting an application for Transfer of Licenses and Exemptions with FERC within five (5) days after being designated the successful bidder in Bankruptcy Court at the sale hearing, and shall request such transfer be considered on an expedited basis**.

**Section 11.5 <u>Trade Payables</u>.** For the avoidance of doubt, Sellers shall be solely responsible to pay all accounts payable before closing.

**Section 11.6 <u>Taxes</u>.** All real estate and personal property taxes and special or other assessments or levies in respect of the property, sales, revenue and excise taxes (relating to Facilities operations), telecommunications service taxes, water and sewer rents, rates and charges and vault charges, other municipal permit fees and governmental assessments shall be apportioned as of the Adjustment Time.

Sellers shall pay or cause to be paid all sales, revenue and excise taxes (and any surtax, interest and penalties thereon) (collectively, "<u>Sales Tax</u>") payable with

21

respect to Sellers' operation of the Facilities for periods prior to the applicable Adjustment Time, For the avoidance of doubt, Seller is solely responsible for the payment out of the Purchase Price of all outstanding real estate taxes.

**Section 11.7 <u>Utilities</u>.** Utilities and fuel, including, without limitation, steam, water, electricity, gas and oil shall be prorated as of Adjustment Time. Sellers shall use their commercially reasonable efforts to cause the meters, if any, for utilities to be read on the Closing Date and to pay the bills rendered on the basis of such readings. If any such meter reading for any utility is not available, then proration therefor shall be made on the basis of the most recently issued bills therefor. Notwithstanding anything herein to the contrary, the Purchase Price shall be increased by an amount equal to the value of any refundable pre-paid deposits made to utility companies, which are transferred to Purchaser.

## ARTICLE XII
## APPORTIONMENT PROCEDURES

**Section 12.1 <u>Draft Settlement Statement</u>.** Not later than five (5) business days prior to the Closing Date, Sellers and Purchaser shall jointly prepare, or cause to be prepared, a draft settlement statement, and to the extent not inconsistent therewith generally accepted accounting principles, setting forth amounts to be prorated between Sellers and Purchaser at the Closing pursuant to this Section 12.1, together with reasonable documentation supporting the information set forth in such settlement statement. The draft settlement statement shall contain Sellers' good faith estimate of the amounts (based on facts and circumstances then known to Sellers), as of the anticipated applicable Adjustment Time, of the items to be prorated between Sellers and Purchaser, or to be credited to either Party, pursuant to this Section 12.1.

**Section 12.2 <u>Apportionment at Closing</u>.** Sellers and Purchaser shall cause the information set forth in the draft settlement statement to be updated with actual information available as of the applicable Adjustment Time. With respect to any matter on which Sellers and Purchaser still disagree as of such time, Sellers' good faith determination of the amount in question as of the applicable Adjustment Time will be used for purposes of such Closing unless Purchaser requests a review by the Accountants. Notwithstanding the foregoing, the computation of the adjustments, upon the request of either Purchaser or Sellers, shall be reviewed by an accounting firm selected by the requesting Party (the "<u>Accountants</u>") and reviewed by representatives of both Purchaser and Sellers. All determinations made by the Accountants with respect to Article XII shall be binding on both Sellers and Purchaser, subject to the post-Closing reconciliation described in Section 12.7. The fees and expenses of the Accountants shall be borne by the Party requesting the Accountants' review.

**Section 12.3 <u>Representatives</u>.** Purchaser and Sellers have the right to have their representatives present prior to, at or after the applicable Adjustment Time for the purpose of observing the taking of any inventories (including the counting of house funds), or for any other matters to be performed pursuant to ARTICLE XI and XII, and

22

such representatives shall be given reasonable access at reasonable times to the books and records of the Facilities being transferred which are relevant to the preparation of the closing apportionments in accordance herewith. The Purchaser and Sellers shall each be liable for the charges of their own respective representatives in conducting and supervising such audits and inventories.

Section 12.4 **Calculations.** All prorations shall be made on the basis of the actual number of days in the year and month in which the Closing occurs or in the period of computation. Except as otherwise expressly provided herein, all apportionments and adjustments shall be made on an accrual or cash basis as set forth herein.

Section 12.5 **Post-Closing Access.** Purchaser shall retain, for at least three (3) years after the Closing (or such longer period as may be required by any Governmental Authority or ongoing claim), the books and records of the Facilities with respect to the seven (7) year period immediately preceding the Closing Date. For such three (3) year period after the Closing, Sellers (including, for clarity, any trust established under a Chapter 11 plan of Sellers or any other successors of Sellers), Algonquin, and any of their representatives shall have reasonable access to the books and records of the Facilities during regular business hours (a) for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, and Sellers (including any such trust or successors), Algonquin and their representatives shall have the right to make copies of any such files, books, records and other materials and (b) to enable Sellers to prepare all necessary financial documents and tax returns, and to audit the same at its sole expense with respect to the period of ownership or operation of the Facilities by Sellers; provided, that (i) Sellers or Algonquin shall not unreasonably interfere with the operation of the Facilities, (ii) a representative of the Purchaser shall have the right, upon request, to accompany Sellers and Algonquin during such access, (iii) if an audit of such books and records pertaining to the period prior to Closing occurs, Sellers shall remove or cause to be removed the relevant materials from the Facilities so that the audit does not take place on the Facilities, and (iv) Purchaser shall not be responsible for books and records that are damaged (other than through Purchaser's intentional misconduct) or that are stolen. Purchaser shall reasonably cooperate with Sellers in connection with such audit. The terms of this Section 12.5 shall survive Closing and the delivery of the Deed.

Section 12.6 **Post-Closing Adjustments.** To the extent that any of the prorations made on the Closing Date pursuant to this Article XII are based upon estimates of payments to be made to and/or expenses to be paid by Purchaser or Sellers subsequent to the Closing Date which later prove inaccurate or otherwise are determined by either Party to have been erroneously made, and the aggrieved Party has notified the other Party hereto of the specific inaccuracy or other error on or before that date which is sixty (60) calendar days after the Closing Date, Sellers and Purchaser agree to adjust such prorations promptly upon receipt by Sellers or Purchaser, as the case may be, of bills or other documentation setting forth the actual and/or correct

23

amount of such payments or expenses. Notwithstanding the foregoing, Sellers and Purchaser agree to cooperate in good faith to determine any pre-closing estimates as close as possible to their expectations about the actual items, with a view toward minimizing as much as practical the need for post closing adjustments.

## ARTICLE XIII

## TRANSITION PROCEDURES

**Section 13.1 Licenses and Permits.** Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall be responsible for obtaining the transfer of all Licenses and Permits (to the extent transferable) or the issuance of new licenses and permits, including, without limitation, the licenses and permits required for the operation of the Facilities (the "Licenses"). **Purchaser shall be responsible for submitting an application for Transfer of the Licenses and Exemptions with FERC within five (5) days after being designated the successful bidder in Bankruptcy Court at the sale hearing, and shall request such transfer be considered on an expedited basis**. Purchaser, at its cost and expense, shall submit all necessary applications and other materials to the appropriate Governmental Authority and take such other actions to effect the transfer of Licenses and Permits or issuance of new licenses and permits, including, and Sellers shall use commercially reasonable efforts (at no cost or expense to Sellers other than any de minimis cost or expense or any cost or expense which Purchaser agrees in writing to reimburse) to cooperate with Purchaser to cause the Licenses and Permits to be transferred or new licenses and permits to be issued to Purchaser. It is the Purchaser's obligation to satisfy all obligations for issuance or transfer of any license or license exemption as the case may be.  If this Agreement is terminated for any reason and Purchaser has filed an application or otherwise commenced the processing of obtaining new licenses and permits, Purchaser shall withdraw all such applications and cease all other activities with respect to such new licenses and permits

**Section 13.2 Transition Procedures.** Sellers (at no cost or expense to Sellers other than any de minimis cost or expense or any cost or expense which Purchaser agrees in writing to reimburse) (A) shall reasonably cooperate with Purchaser and its reasonable requests in connection with an orderly transition and turnover of the Acquired Assets to Purchaser, and (B) shall (i) make commercially reasonable efforts to cooperate with Purchaser and its reasonable requests in connection with an orderly transition and turnover of the Acquired Assets to Purchaser, (ii) assign to Sellers immediately prior to Closing all of Sellers' right, title and interest in and to Equipment Leases (and other applicable agreements, if identified by Purchaser pursuant to the Sale Procedures Order) to be assumed by Purchaser at Closing under this Agreement, and (iii) make commercially reasonable efforts (in accordance with a reasonable schedule to be determined by Sellers and Purchaser) to provide to Purchaser, any information in its possession relating to the Acquired Assets with respect to the period from and after Closing.

24

**Section 13.3 <u>Survival</u>.** The terms of this ARTICLE XIII shall survive Closing and the delivery of the Deed.

## ARTICLE XIV

## CASUALTY LOSS; CONDEMNATION

**Section 14.1 <u>Termination</u>.** If, prior to Closing, (a) any portion of the Acquired Assets are subject to a taking by a public authority (a "<u>Material Taking</u>") or (b) any portion of the Acquired Assets are destroyed or suffer material damage (a "<u>Material Casualty</u>"), then Purchaser shall have the right to reduce the Purchase Price by that portion of the Purchase Price allocated to that Acquired Asset as designated on Schedule 2.3. Purchaser is obligated to proceed with the closing of the balance of the Acquired Assets as provided for herein.

**Section 14.2 <u>Non-Termination</u>.** In the event that (a) prior to Closing any non-material portion of the Acquired Assets is subject to a taking by a public authority (a "<u>Non-Material Taking</u>") or (b) the Acquired Assets suffer non-material damage by reason of an event or casualty (a "<u>Non-Material Casualty</u>"), the Purchaser shall accept the Acquired Assets in their then condition and proceed with the Closing without any abatement of the Purchase Price whatsoever, in which event, at Closing, all of the insurance proceeds, condemnation award, or right to such proceeds or condemnation award, shall be assigned by Sellers to Purchaser and any monies theretofore received by Sellers which have not been used by Sellers on account of any reasonably necessary repairs or restorations in connection with such fire or other casualty or condemnation shall be paid over to Purchaser, along with an amount equal to any applicable deductibles.

**Section 14.3 <u>Notice; Materiality</u>.** Sellers shall give Purchaser prompt notice of any damage to or destruction of the Acquired Assets or of the institution of any proceedings for condemnation of all or any portion of the Acquired Assets. For the purposes of this ARTICLE XIV, damage to or the taking of a portion of the Acquired Assets shall be deemed to be material if (i) the reasonably estimated cost of restoration or repair of the damage or the diminution of the value of the remaining Acquired Assets on account of the taking, as the case may be, shall exceed $500,000.

**Section 14.4 <u>Survival</u>.** The terms of this ARTICLE XIV shall survive Closing and the delivery of the Deed.

## ARTICLE XV

## MISCELLANEOUS

**Section 15.1 <u>Broker's and Finder's Fees</u>.** Each party represents and warrants that it has not had any contact or dealings regarding the Acquired Assets, or any communication in connection with the subject matter of this transaction, through any licensed real estate broker, entity, agent, commission salesperson, or other person who

25

will claim a right to compensation or a commission or finder's fee as a procuring cause of the sale contemplated herein, except for Clearbid Capital, LLC, whose commission shall be paid by Sellers at Closing subject to that certain Order Authorizing Appointment of Clearbid Capital, LLC As Investment Banker And Financial Advisor [Docket No. 1257].  Purchaser shall indemnify, defend and hold harmless Sellers from and against any and all claims for such commissions, fees or other payments arising from Purchaser's actions.

Section 15.2 **Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of New York (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court in the Northern District of New York (Utica Division), the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  The Bankruptcy Court retains jurisdiction to interpret all orders entered in the Debtors bankruptcy cases.  If the Debtors' bankruptcy cases are dismissed or Sellers are otherwise no longer subject to the jurisdiction of the Bankruptcy Court, any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby must be brought in the courts of the State of New York, Onondaga County or the United States District Court for the Northern District of New York, and by execution and delivery of this Agreement, each of the Parties consents to the non-exclusive jurisdiction of those courts. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.

Section 15.3 **Integration; Survival.** This Agreement contains the entire understanding among the parties hereto with respect to the transactions contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. Except as otherwise expressly provided herein, the covenants, agreements, representations and warranties contained in this Agreement shall not survive the Closing and the delivery of the Deed.

Section 15.4 **Amendment.** Immaterial modifications, amendments, or supplements to this Agreement may be made only by the written agreement of Sellers and Purchaser.  Material modifications, amendments, or supplements to this Agreement must be submitted to the Bankruptcy Court for its approval.

Section 15.5 **Waiver.** Except as expressly provided otherwise in this Agreement, (i) no failure by Sellers or Purchaser to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of such or any other covenant, agreement, term or condition, (ii) any waiver of any covenant, agreement, term or condition of this Agreement shall be enforceable only if in

26

writing, and (iii) no waiver, except as both parties agree in writing, shall affect or alter the remainder of this Agreement, but each and every covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach.

Section 15.6 **Counterparts.** This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all the parties notwithstanding that all the parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing its signature hereto, and upon receipt of the signature of the other party hereto as provided in the following sentence. The parties agree that this Agreement may be transmitted between them by facsimile machine or e-mail transmission. The parties intend that faxed signatures or e-mail transmission of .pdf signatures constitute original signatures and that a faxed copy or a .pdf copy of the Agreement containing the signatures (original, faxed or e-mailed by .pdf) of all the parties is binding on the parties.

Section 15.7 **Notices.** All notices hereunder shall be deemed to have been duly given on the date of delivery if delivered in person, by facsimile during regular business hours on a business day (otherwise receipt shall be deemed to have occurred on the next succeeding business day), or the following business day after being sent by overnight delivery by a nationally recognized overnight delivery service such as UPS or Federal Express, addressed as follows:

To Sellers:

Trafalgar Power, Inc. and Christine Falls of New York, Inc.
Attn: Arthur Steckler, President
TBD

With a copy to:
Harris Beach PLLC
Attn: Wendy Kinsella, Esq.
David Capriotti, Esq.
333 West Washington Street
Suite 200
Syracuse, NY  13202
Phone: (315) 423-7100
Fax: (315) 422-9331

To Purchaser:

Name
Address
City State Zip
Attn: name
[PHONE]

[FAX]

With a copy to:
Name
Address
City State Zip
Attn: name
[PHONE]
[FAX]

or to such other address as shall be furnished in writing by either party to the other.

**Section 15.8 <u>Successors Bound</u>.** The provisions of this Agreement shall extend to, bind land inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors, and permitted assigns.

**Section 15.9 <u>No Third-Party Beneficiaries</u>.** The parties do not intend for any other person or entity to be, and no such other person or entity shall be, a third-party beneficiary hereunder.

**Section 15.10 <u>Time</u>.** Time is of the essence in this Agreement. In the computation of any period of time provided for in this Agreement or by law, the day of the act or event from which said period of time runs shall be excluded, and the last day of such period shall be included, unless it is not a business day, in which case the period shall be deemed to run until the end of the next day which is a business day. For all purposes of this Agreement, a "business day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York.

**Section 15.11 <u>Incorporation of Recitals and Exhibits</u>.** All recitals and exhibits to this Agreement are incorporated herein by reference.

**Section 15.12 <u>Captions</u>.** The captions of the various sections and paragraphs of this Agreement have been inserted only for the purpose of convenience; such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

**Section 15.13 <u>Assignment</u>.** Neither party shall voluntarily or by operation of law assign or transfer any right, interest or obligation hereunder without the other party's express prior written consent, which consent may be given or withheld in such party's sole and absolute discretion.

28

**Section 15.14 <u>Additional Documents</u>.** Each party agrees to execute any additional documents reasonably requested by the other party or the Title Company to carry out the intent of this Agreement.

**Section 15.15 <u>Severability</u>.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**Section 15.16 <u>Recordation</u>.** Neither party shall record this Agreement or a memorandum or other notice thereof in any public office without the express written consent of the other party, which consent may be given or withheld in such party's sole and absolute discretion. A breach of this covenant shall constitute a material default by such party under this Agreement.

**Section 15.18 <u>Public Announcements</u>.** Notwithstanding Section 3.7(a), any Party shall have the right upon Closing to make a public announcement regarding the transaction described in this Agreement, provided that Seller and Purchaser shall approve the form and substance of any such public announcement, which approval shall not be unreasonably withheld, conditioned or delayed, except if a Party is required to make a public announcement under applicable law, in which case no such approval by the other Party shall be required but such Party (i) shall provide the other Party prior written notice prior to the expiration of the Due Diligence Period that such public announcement is required under applicable law, and (ii) shall consult with the other Party regarding the form and substance of such public announcement.

**Section 15.19 <u>TRIAL BY JURY</u>.** PURCHASER AND SELLER, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE DOCUMENTS CONTEMPLATED HEREBY, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PURCHASER AND SELLER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE.

213834 2295450v11

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties as of the Effective Date.

SELLERS:

TRAFALGAR POWER, INC.

By: _____

Name: Arthur Steckler

Title:  President

CHRISTINE FALLS OF NEW YORK, INC.

By: _____

Name:  Arthur Steckler

Title:  President

PURCHASER:

By:_____

Name:

Title:

30